

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-2002

# Congregation KOL AMI v. Abington

Precedential or Non-Precedential: Precedential

Docket No. 01-3077

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Congregation KOL AMI v. Abington" (2002). *2002 Decisions.* Paper 655.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/655

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 16, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3077

CONGREGATION KOL AMI; ELLIOT HOLIN, Rabbi

v.

ABINGTON TOWNSHIP;
BOARD OF COMMISSIONERS OF ABINGTON TOWNSHIP;
THE ZONING HEARING BOARD OF ABINGTON
TOWNSHIP; LAWRENCE T. MATTEO, JR., In his official
capacity as Director of Code Enforcement of
Abington Township

Board of Commissioners of Abington Township;
The Zoning Hearing Board of Abington Township;
Lawrence T. Matteo, Jr., In his official capacity
as Director of Code Enforcement of Abington Township,
Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 01-cv-01919)
District Judge: Honorable Clarence C. Newcomer

Argued: July 29, 2002

Before: BECKER, Chief Judge, ROTH and
RENDELL, Circuit Judges.

(Filed: October 16, 2002)

MARCI A. HAMILTON, ESQUIRE
  (ARGUED)
36 Timber Knoll Drive
Washington's Crossing, PA 18977

HARRY G. MAHONEY, ESQUIRE
CARLA P. MARESCA, ESQUIRE
MICHAEL L. BARBIERO, ESQUIRE
Deasey, Mahoney & Bender
1800 John F. Kennedy Blvd.
Suite 1300
Philadelphia, PA 19103

Counsel for Appellants

JEROME M. MARCUS, ESQUIRE
JONATHAN AUERBACH, ESQUIRE
Berger & Montague
1622 Locust Street

Philadelphia, PA 19103

ANTHONY R. PICARELLO, JR.,
 ESQUIRE (ARGUED)
ROMAN P. STORZER, ESQUIRE
The Becket Fund for Religious
 Liberty
1350 Connecticut Avenue, NW,
 Suite 605
Washington, DC 20036

Counsel for Appellees

2

D. MICHAEL FISHER, ESQUIRE
Attorney General
HOWARD G. HOPKIRK, ESQUIRE
Deputy Attorney General
CALVIN R. KOONS, ESQUIRE
Senior Deputy Attorney General
JOHN G. KNORR, III, Esquire
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of Attorney General of
 Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

Counsel for Amicus-Curiae Appellant
Commonwealth of Pennsylvania

STEFAN PRESSER, ESQUIRE
LARRY FRANKEL, ESQUIRE
American Civil Liberties Union
125 South Ninth St., Suite 701
Philadelphia, PA 19107

Counsel for Amicus Curiae-Appellees
The American Civil Liberties Union of
Pennsylvania and The American
Jewish Committee

RONALD A. KRAUSS, ESQUIRE
Campbell, Campbell, Edwards
 & Conroy
1265 Drummers Lane, Suite 200
Wayne, PA 19087

MARK D. STERN, ESQUIRE
American Jewish Congress
15 East 84th Street
New York, NY 10028

Counsel for Amicus Curiae-Appellee
The American Jewish Congress

3

OPINION OF THE COURT

BECKER, Chief Judge.

Congregation Kol Ami (the "Congregation") is a Reform Jewish Synagogue that desires to relocate to a 10.9-acre parcel of land in the midst of a purely residential section of Abington Township ("Abington" or "the Township") in the Philadelphia suburbs, zoned R-1 residential under the Township Zoning Ordinance. After the Congregation entered into an agreement of sale with the Sisters of Nazareth, the current owners of the property, it sought zoning approval from the Township Zoning Hearing Board ("ZHB") seeking either a variance or a special exception, and alternatively, permission to use the property as an existing non-conforming use. When the Congregation's application was denied by the ZHB, the Congregation, along with its Rabbi, Elliot Holin, filed suit in the District Court for the Eastern District of Pennsylvania against the ZHB, Abington Township, its Board of Commissioners, and its Director of Code Enforcement in both his individual and official capacities, seeking injunctive, declaratory and compensatory relief for alleged civil rights violations pursuant to 42 U.S.C. S 1983. The complaint also alleged a violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. S 2000 et seq.; the Municipalities Planning Code, 53 P.S. S 11001A-11005A; Article I, sections 3, 7, 20 and 26 of the Pennsylvania Constitution; and the First and Fourteenth Amendments of the United States Constitution. [1a-20a].

Central to the case are certain provisions of the Abington Township Zoning Ordinance whose purpose, under a 1996 Amendment, is "to provide low density, single family, neighborhoods." Under the Ordinance, the R-1 Residential District only permits a handful of uses by right: agriculture, livestock, single family detached dwellings, and conservation and recreation preserve. Similarly, the Ordinance only permits a handful of uses by "special exception," including a kennel, riding academy, municipal complex, outdoor recreation, emergency services, and utility

4

facilities. The Ordinance does not permit churches or other religious institutions in R-1, except those that are legal, nonconforming uses, even by special exception. Nor does it allow a myriad of other uses such as schools, hospitals, theaters, and daycare centers in R-1 Residential Districts. These uses are, however, permitted in other districts in the Township.

The Congregation moved for partial summary judgment on its claim that the Ordinance is unreasonable on its face because it prohibits houses of worship from locating in residential neighborhoods. The District Court granted the Congregation's motion, finding instead that the Ordinance, as applied, violated the Equal Protection Clause of the

United States Constitution. The Court reasoned that a "house of worship inherently further[s] the public welfare," and that the Township had no rational reason to allow some uses by special exception, such as a country club subsumed under "outdoor recreation," but not the Congregation. The Court granted injunctive relief, ordering the ZHB to conduct hearings on the Congregation's application for a special exception. The Court denied the Township's motion for reconsideration.

The Township appealed, and asked for a stay of the injunction, both in the District Court and in this Court, but those applications were also denied. The ZHB held the special exception hearing and concluded that the proposed use would not "adversely affect the health, safety and welfare of the community," and that the use was "consistent with the spirit, purpose, and intent of the Ordinance." [3907a]. These are the requirements for a special exception, which must be awarded if they are met. The ZHB thus granted the Congregation a special exception with some limitations aimed at traffic, light pollution, and noise. [3907a-3909a]. Since then, the Township has also approved the Congregation's land development plan. The Congregation, however, has not begun building on the property; it awaits the outcome of the appeal brought in this Court, and one brought in the Montgomery County Court of Common Pleas by neighbors who oppose the synagogue use. For reasons explained at length infra, given the tenor of the District Court's holding, which functionally

5

altered the Township's zoning ordinance and poses a continuing burden on its enforcement, we conclude that the grant of the special exception did not moot the case, hence we reject the Congregation's mootness argument.

The District Court's holding of unconstitutionality rested on its reading of City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985), where the Supreme Court concluded that similarly situated group homes were impermissibly treated differently because one home's occupants were mentally handicapped. The District Court in effect read City of Cleburne as standing for the proposition that a municipality's decision to distinguish between land uses is not rational if both uses, permitted and not-permitted, have the same impact on the municipality's asserted goals. In so concluding, the District Court overlooked the threshold step that must be taken under the City of Cleburne analysis-- the court must first conclude that the two land uses are "similarly situated."

The Township submits that the Congregation's use is different from the other uses permitted by special exception. It also contends that it had good reason to group churches and other religious institutions in the CS-Community Service District with other institutional uses, such as hospitals and schools, and that it was not irrational to allow outdoor recreation and certain other uses

in the R-1 Residential District (by special exception). The Township invokes the well-established principle that, in the federal Constitutional universe, federal courts accord substantial deference to local government in setting land use policy, and that only where a local government's distinction between similarly situated uses is not rationally related to a legitimate state goal, or where the goal itself is not legitimate, will a federal court upset a local government's land use policy determination. It argues that the distinction between religious uses and other uses is not only rational, but that under the District Court's analysis, any use, or at least any religious use with a similar impact, can automatically locate in the R-1 Residential District with special exception thereby giving a preference to religion, in contradiction of the principles of local land use law.

The Township's arguments are forceful, but we will not resolve them here, because the District Court did not address the similarity of uses question, and the Abington Ordinance is not so clearly drafted that we may definitively determine what uses are permitted by special exception on our own. Put differently, because the District Court failed to evaluate whether the Congregation was similarly situated, i.e., similar in "kind," to the uses that are currently permitted in the R-1 Residential District, we must vacate its order and remand so that the proper inquiry may be conducted. Since the special exception hearing was held pursuant to an improper order by the District Court, the resulting grant of special exception by the ZHB and the land use permit issued by the Township are null and void.

I. Facts and Procedural History

The Congregation is a Reform Jewish Synagogue, founded in 1994, which conducts religious services, Hebrew classes, and other related activities at various locations in eastern Montgomery County. The Township is a political subdivision located in eastern Montgomery County. It operates pursuant to the First Class Township Code of Pennsylvania, 53 P.S. S 55101 et seq., and with respect to zoning, subdivision and land use matters, in accordance with Pennsylvania Municipalities Planning Code, 53 P.S. S 101 01 et seq. The ZHB has jurisdiction to hear and render final adjudication on, inter alia, applications by landowners for variances from and special exceptions under the Township's Zoning Ordinance. The ZHB and the Township are separate entities. As we understand the practice, the Township does not customarily appear before the ZHB to state a position on an application, although it is not foreclosed from doing so.

A. The History of the Relevant Zoning Ordinance

In 1977, The Township developed a Comprehensive Plan for development within the Township. [337a]. As part of this Comprehensive Plan, The Township enacted Ordinance No. 1469, which established a "V-Residence" District. Article III,

S 301. [477a, 512a]. In the V-Residence District, pursuant

to S 301.2, certain uses were permitted as of right: single-family detached dwellings, tilling of the soil, township administrative buildings, public libraries, public parks, play or recreational areas, or any similar uses operated by the Township or other governmental agencies. [512a]. Other uses, such as churches, rectories, parish houses, convents, monasteries and other similar institutions, were permitted as "special exceptions"; the ZHB may grant a"special exception" to certain predetermined uses and in so doing it may attach conditions to the grant of the exception in order to preserve the purpose of the zoning ordinance.

On March 8, 1990, The Township enacted Ordinance No. 1676, which amended S 301.2 of Ordinance No. 1469 (the "V-Residence District"). [806a]. The amendment, as it pertains to the issues in this case, eliminated all uses by right except single-family detached dwellings, and accessory uses on the same lot that are customarily incidental to single-family dwellings. [806a]. All of the uses previously permitted by special exception, including "religious" uses, were eliminated. The purpose of this amendment, as stated in the "Legislative Intent" of the Ordinance, was to create a "low density" area for single-family detached dwelling units. [806a].

On May 9, 1996, The Township re-classified its zoning ordinances pursuant to Ordinance No. 1753 (the "Ordinance"). [977a]. This Ordinance changed the designation of The Township's "low density residential district" from V-Residence to R-1 Residential.[999a]. Section 301 of the Ordinance permitted the following uses in R-1 by right: agriculture, livestock, single family detached dwellings, conservation and recreation preserve. [1000a]. Uses permitted by special exception include: kennel (defined at 1074a), riding academy, municipal complex (defined [at 1094a] to include municipal administration buildings, libraries, police barracks, or road maintenance facilities), outdoor recreation (defined in Article IV, section 706(G)(6) of the 1996 Ordinance to include "public or private miniature golf courses, swimming pools, ball courts, tennis courts, ball fields, trails, and similar uses, . . . [o]utdoor recreation shall[also] include any accessory use, such as snack bar, pro shops, club

houses, country clubs"), emergency services, and utility facilities (defined [at 1108a] to include, inter alia, train stations and bus shelters). The stated purpose of the R-1 Residential District was "to provide low density, single family, neighborhoods." [1000a].

Churches and other religious institutions, except those that are legal, nonconforming uses, are not permitted in

R-1 Residential Districts.1 Although religious institutions
are not explicitly excluded by the language of the
Ordinance, they are de jure excluded from that particular
zone because they are not specifically listed among the uses
that may apply for special exceptions. Apparently, the only
option for a religious institution wishing to locate in an R-1
Residential District is to apply for a variance with the ZHB.
According to the Ordinance, a variance is a "grant of
relaxation by the [ZHB] from the dimensional and use
regulations of th[e] Ordinance, when such action will not be
considered contrary to the public interest, and where,
owing to conditions unique to the property, and not
resulting from the actions or situation of the applicant, a
literal enforcement of this code would result in undue and
unnecessary hardship." [997a].

The variance standard is very different from the special
exception standard because it requires the applicant to
demonstrate "unnecessary hardship," which requires
evidence that: "(1) the physical features of the property are
such that it cannot be used for a permitted purpose; or (2)
that the property can be conformed for a permitted use only
at a prohibitive expense; or (3) that the property has no
value for any purpose permitted by the zoning ordinance."
Hertzberg v. Zoning Bd. of Adjustment, 554 Pa. 249, 721
A.2d 43, 47 (1998). In contrast, for an application to merit
a special exception, it need only establish that the zoning

---

1. A non-conforming use is defined as: "A building, lot, structure, sign or
use, which lawfully existed prior to the adoption, revision or amendment
of this Ordinance, but does not comply with zoning use or district
regulations by reasons of adoption, revision, or amendment of this
Ordinance." [993a; see also 1191a]. Of the 36 churches and synagogues
currently operating in the Township, 29 of them are legal, non-
conforming uses outside of the CS, M, and A-O Districts. 25 of those
places of worship are located in residential districts.

ordinance allows the use and that the particular use
applied for is consistent with the public interest. Ryan,
Pennsylvania Zoning Law and Practice, Vol. 2 SS 5.1.2,
6.1.5; Heck v. Zoning Hearing Bd., 39 Pa. Commw. 570, 397
A.2d 15 (1979). If that showing is made, the special
exception must be granted, though appropriate conditions
may be attached.

Religious institutions are permitted in the Township
under the Ordinance in the CS-Community Service District.
[1024a]. In fact, the CS-District was specifically designed to
provide for, inter alia, the religious needs of the Township
community. [1024a]. The Township has provided for other
institutional uses that are excluded from the R-1
Residential District in the CS-District, including hospitals,
schools, and community service centers. Religious
institutions are also permitted in the M-Mixed Use District
[1028a], and, by special exception, in the A-O
Apartment/Office District. [1019a].

B. The History of the Property At Issue

The real property in question is located at 1908 Robert Road and is zoned R-1 Residential. [298a]. It consists of a 10.9-acre parcel of land, on which there are several buildings. Prior to 1951, the property was a 38-acre piece of land used as a residence by a family. At that time, there were three buildings on the 10.9 acres which are the subject of this lawsuit: a three-story masonry residence, a detached garage, and a two-story auxiliary residence, all constructed in the mid-twenties. [292a].

In 1951, the property was purchased by the Sisters of Nazareth, an Order of Roman Catholic Nuns. The Sisters constructed additions as well as other buildings, including a chapel and a 13,300 square foot main building.[292a]. The property was used as a convent, [292a], and at its peak, it was home to over 80 Sisters. [292a]. The nuns used the convent to receive daily instruction on religious life, engaging in prayer for up to two and a half hours per day. [305a]. The Sisters had only limited contact with the outside world; visitors to the property were limited to visiting on special occasions, and visits would not occur

10

more than twice per year. [305a]. Ceremonies and religious services were rarely attended by persons other than the Sisters and their relatives. [305a]. On a daily basis, the average number of vehicles parked at the property was five, and the primary use of the property was as a residence. [305a].

Until 1988, the 38-acre parcel had direct access to Valley Road, a major road in The Township, by means of a long driveway. In 1988, however, the Sisters subdivided the parcel and sold off nearly 28 acres as residential property, leaving the 10.9-acre plot before us, but relinquishing direct access to Valley Road. Then, in 1995, due to a decline in the number of nuns on the property, the Sisters leased the property to a community of Greek Orthodox Monks for religious services, family retreats, religious study, and prayer. [293a, 307a]. Since the 1990 amendments had removed religious uses from the list of uses permitted by special exception, the Monks filed an application with the ZHB seeking a variance from the Ordinance to use the property as a monastery. The ZHB granted this request, with certain conditions. [291a]. One of the conditions was that the property deed be restricted to prevent further subdivision, and that a driveway be constructed off of Robert Road (a 30-foot wide cul-de-sac road). A stone driveway off of Robert Road is currently the only access to the property. The surrounding area is completely residential, consisting of well-kept single-family homes on large plots abutting shady streets. The immediate block from which the driveway extends ends in a cul-de-sac.

C. History of the Current Litigation

In August 1999, the Congregation entered into an agreement with the Sisters to purchase the property, and to use it as a place for worship. [304a]. The Congregation filed an application with the ZHB, seeking to use the property as an existing non conforming use, or for a variance, or special exception. [2795a]. The Congregation proposed the following regularly scheduled uses: (1) Shabbat services on alternate Fridays and Saturdays for up to an hour and a half; (2) Hebrew classes on Wednesdays from 4pm to 8pm;

11

and (3) religious classes for 2 hours on Sunday mornings. [1360a-1368a]. Other uses would include four High Holy Day services in the fall, religious meetings, Bar and Bat Mitzvah services, outdoor wedding ceremonies, and other similar celebrations and receptions to follow. [1369a-1379a, 1435a]. As part of its proposal, the Congregation sought permission to change the driveways, roadways, and parking lots on the property. [2798a].

The ZHB rejected the Congregation's application, concluding that the principal use of the property by the Sisters was residential, and that the chapel was an accessory use to the property. The ZHB further noted that the principal use by the Monks was also residential. The ZHB concluded that the use of the property by the Sisters was as a residential use in the V-Residential District, which was lawfully permitted there. The ZHB ruled that if the use by the Sisters was non-conforming, the Sisters had abandoned the non-conforming use by filing a preliminary subdivision plan (and by its subsequent approval) but that, at all events, the grant of a variance to the Monks extinguished any non-conforming use. Since the Congregation's proposed use of the property was for religious not residential purposes, there was no continuing non-conforming use from the Sisters or the Monks. Since religious institutions are not permitted in the R-1 Residential District, the ZHB denied the request for continuation as a non-conforming use.

The ZHB also concluded that the Congregation had failed to show that it was entitled to a variance because there were no unique physical features of the property that would preclude it from being used as zoned, and that the Congregation had failed to demonstrate unnecessary hardship. In so concluding, the ZHB observed that the Ordinance does not impose a substantial burden on the religious exercise of any person because religious institutions are permitted in three other zoning districts within the Township. [297a-320a].

The Congregation had the right to file an appeal to the Court of Common Pleas of Montgomery County to challenge the ZHB's decision. Instead, the Congregation filed the present lawsuit in the District Court for the Eastern District

of Pennsylvania, seeking injunctive, declaratory and compensatory relief for: alleged civil rights violations pursuant to 42 U.S.C. S 1983; violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. S 2000 et seq.; the Municipalities Planning Code, 53 P.S. S 11001A-11005A; Article I, sections 3, 7, 20 and 26 of the Pennsylvania Constitution; and the First and Fourteenth Amendments of the United States Constitution. [1a-29a].

The Congregation moved for partial summary judgment on its claim that the Ordinance is unreasonable on its face because it prohibits houses of worship from locating in residential neighborhoods. Essentially, this was a challenge to the facial validity of the Ordinance based on both state and federal constitutional law; the Congregation did not argue or present evidence that the Ordinance was unconstitutional as applied. The District Court granted the Congregation's motion for partial summary judgment. In so doing, the Court declined to rule on the facial validity of the Ordinance. Instead, based on the argument presented in the Township's cross-motion for summary judgment, the Court concluded that the Ordinance, as applied, violated the Equal Protection Clause of the United States Constitution. Congregation Kol Ami v. Abington Township, 161 F. Supp.2d 432, 435-37 (E.D.Pa. 2001).

The Court relied on the Supreme Court's decision in City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985), which applied rational basis review to a zoning ordinance that required special-use permits to operate group homes for the mentally handicapped but not similar homes for other occupants, such as senior citizens and fraternities. The critical portions of the District Court's ruling were terse. First, it explained the relevance of Cleburne:

> In that case, just as in the instant case, the defendant city argued that the ordinance was aimed at avoiding concentration of population and at lessening congestion of the streets. However, the Court concluded that "these concerns obviously fail to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit."

Congregation Kol Ami, 161 F. Supp.2d at 436 (quoting Cleburne, 473 U.S. at 450). In so doing, (here and later), the Court looked to only part of the analysis in Cleburne for the proposition that a zoning ordinance is not rational when the impact of permitted and non-permitted uses is similar.

The Court then went on to state:

> Not only does a house of worship inherently further the

public welfare, but defendants' traffic, noise and light
concerns also exist for the uses currently allowed to
request a special exception. Indeed, there can be no
rational reason to allow a train station, bus shelter,
municipal administration building, police barrack,
library, snack bar, pro shop, club house, country club
or other similar use to request a special exception
under the 1996 Ordinance, but not Kol Ami. Because
the ZHB failed to consider whether traffic, noise, light
or other disruptions warrant the denial of a special
exception, and failed to apply the 1996 Ordinance in a
way that accounts for that Ordinance's differing
treatment of Kol Ami from the other permitted uses by
special exception, the Court finds that defendants
denied plaintiffs rights secured by the Constitution.

Congregation Kol Ami, 161 F. Supp.2d at 437. These
statements were made without elaboration or citation.
However, in their wake the Court granted injunctive relief to
the Congregation, ordering the ZHB to conduct hearings on
the Congregation's application for a special exception. The
Township moved for reconsideration, which was denied.

The Township appealed and asked for a stay of the
injunction, both in the District Court and in this Court, but
these applications were denied. The ZHB held the special
exception hearing between August 6 and August 9, 2001.
On August 15, 2001, it concluded that the use would not
"adversely affect the health, safety and welfare of the
community," and that it was "consistent with the spirit,
purpose, and intent of the Ordinance." [3907a]. Thus, the
ZHB allowed the use by the Congregation, albeit with some
limitations aimed at traffic, light pollution, and noise.
[3907a-3909a]. Since then, The Township has also
approved the Congregation's land development plan.

14

However, the Congregation has not begun construction as
it awaits the result of the appeals in this Court, and by
neighbors in the Court of Common Pleas. See
http://www.rluipa.com/cases/KolAmi.html.

We have jurisdiction pursuant to 28 U.S.C. S 1292(a)(1).
We review the grant of summary judgment de novo . See
Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d
Cir. 1996). We apply the same standard as the District
Court in determining whether summary judgment was
appropriate. Michael v. Shiley, Inc., 46 F.3d 1316, 1321 (3d
Cir. 1995). Summary judgment should be granted when
there are no genuine issues of material fact. Fed. R. Civ. P.
56(c). An issue is genuine if a reasonable jury could
possibly hold in the nonmovant's favor on that issue. Boyle
v. County of Allegheny Pennsylvania, 139 F.3d 387, 393 (3d
Cir. 1998).

II. Mootness

As a preliminary matter, we must address the

Congregation's argument that in view of the fact that the ZHB has granted a special exception, there is no meaningful relief that this court can give, and that the case is therefore moot. "A case is moot when issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Erie v. Pap's A.M. , 529 U.S. 277, 287 (2000) (internal citations omitted); see also Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir. 1995) ("As a general principle, once a party has complied with a court order or injunction, and has not been penalized or suffered any prejudice that could be remedied on appeal, the appeal is moot," but also stating that a case is not moot where there exists a " 'subject matter upon which the judgment of the court can operate' to make a substantive determination on the merits.") (internal citation omitted).

The Congregation argues that the Township's appeal of the District Court's July 20, 2001 Order granting injunctive relief became moot on August 15, 2001, the day on which the Township fully complied with that Order by holding a hearing and issuing a written decision on the Congregation's special exception application. In its

submission, once the special exception hearing was held, the injunctive relief ordered by the District Court was fully executed and could not be undone. To properly address this contention we must assess the character of the District Court's ruling and its effect on the parties.

Under the Ordinance, places of worship are not among the uses that are permitted to apply for a special exception. Such an omission is a de jure exclusion of that use from the R-1 Residential District. In its opinion, the District Court took note of the ZHB's failure to specifically address plaintiffs' request for a special exception, the ZHB's conclusion that the Abington Ordinance does not permit places of worship to locate in an R-1 district, and its conclusion that the Ordinance does not specifically allow a special exception for places of worship. The Court then reasoned that a "house of worship inherently further[s] the public welfare," and that the Township had no rational reason to allow some uses by special exception, such as a country club [subsumed under "outdoor recreation]," but not the Congregation. Congregation Kol Ami, 161 F. Supp.2d at 437.

The District Court's conclusion appears to be a blanket determination that, as a category, places of worship cannot be excluded from residential districts. In combination with the Court's Order requiring the ZHB to hold a special exception hearing, the Court functionally altered The Township's Ordinance in two ways. First, it gave the ZHB authority it did not otherwise possess--the authority to entertain a request for a special exception by a place of worship in an R-1 Residential District. Prior to the District Court's Order, the only means for a place of worship to obtain permission to locate in the R-1 Residential District

was by way of a variance. By permitting places of worship to apply for a special exception, the District Court altered the standard of proof that the Congregation must meet in order to obtain approval from the ZHB by removing the much more onerous requirement that the Congregation prove "unnecessary hardship."

As previously mentioned, in order to prove "unnecessary hardship" an applicant must demonstrate that the land cannot be used for a permitted purpose, that converting the

16

land so that it may be used for a permitted purpose is prohibitively expensive, or that the property has no value for any of the permitted purposes. In contrast, in order for an application to get a special exception, it need only establish that the zoning ordinance allows the use and that the particular use applied for is consistent with the public interest. Ryan, Pennsylvania Zoning Law and Practice, Vol. 2 SS 5.1.2, 6.1.5; Heck v. Zoning Hearing Bd., supra. Moreover, if a party meets the requirements of a special exception, the ZHB does not have discretion to deny the special exception -- it must be granted. Thus, the District Court's determination allows religious institutions to get permission to locate in the R-1 Residential District under a burden of proof significantly lower than that required under the Ordinance.

Second, the Court's categorical determination that houses of worship further the public interest opened the door for other places of worship to request the same treatment -- a special exception hearing in residential zones where they are currently excluded. Supreme Court precedent is clear that the First Amendment prohibits municipalities from applying their laws differently among various religious groups. See, e.g., Larson v. Valente, 456 U.S. 228 (1982) (finding state statute that regulated charitable solicitations preferred one denomination over another and therefore violated the Establishment Clause); Fowler v. Rhode Island, 345 U.S. 67 (1957) (holding application of ordinance that prohibited preaching in public parks only against Jehovah's Witnesses but not other ministers violated First and Fourteenth Amendments). Further, discrimination against a future similarly situated religious landowner would be a clear violation of the Equal Protection Clause. See, e.g., Cleburne, supra; Cornerstone Bible Church v. Hastings, 948 F.2d 464 (8th Cir. 1991). As a result, the District Court's determination altered Abington's zoning plan by giving the ZHB authority to grant a special exception to places of worship in an R-1 Residential District not only in this case, but also in future situations where a place of worship seeks to locate in such a district.

These effects, which operate by virtue of the precedential

17

effect of the District Court's opinion (unless reversed on appeal), impose a burden on the Township. As long as a government is saddled with an "ongoing injury" caused by a judgment that its law is unconstitutional, the case is not moot. Erie, 529 U.S. at 288. In Erie, the owner of a nude dancing establishment prevailed in the Pennsylvania Supreme Court, which found the aspect of a city ordinance banning nude dancing unconstitutional under the First Amendment. Before the U.S. Supreme Court heard the city's appeal, however, the owner ceased to offer nude dancing at his establishment and therefore argued that the case was moot. Id. at 286-87. The Court disagreed and concluded that the city suffered an "ongoing injury because it is barred from enforcing the public nudity provisions of its ordinance." Id. at 288. Such is the case here, where Abington is barred from enforcing its zoning ordinance as written. Thus, we conclude that Abington has "suffered . . . prejudice" as a result of complying with the District Court's Order, and that there is an ongoing injury that can be remedied on appeal. Harris, 47 F.3d at 1326; see also 13A Charles A. Wright, et al., Federal Practice and Procedure S 3533.10 (1984).2

The Congregation makes much of the fact that the District Court did not order the ZHB to grant the special exception, but only required it to hold a hearing. That is, because the ZHB's determination to grant the special exception is said to have been "voluntary," the Congregation submits that we do not have any power to undo what has been "voluntarily" done. We disagree. This argument overlooks the fact that the ZHB was completely without authority to consider the request for a special exception absent the District Court's Order, which compelled it to do so. We conclude that the District Court's Order requiring the hearing, but not a particular outcome, is not a jurisdictional obstacle, and that this appeal is not moot. Hence, we turn to the merits.

---

2. Additionally, the neighbors residing near the proposed site are also aggrieved by the District Court's decision, which places an intense use of property squarely within what has heretofore been a quiet residential neighborhood. They are currently challenging the ZHB's approval of a special exception in the Montgomery County Court of Common Pleas.

18

III. Equal Protection Analysis

A.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. This is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, 473 U.S. at 439 (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). However, courts

are reluctant to overturn governmental action on the ground that it denies equal protection of the laws:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

Vance v. Bradley, 440 U.S. 93, 97 (1979).

Like other economic and social legislation, land use ordinances that do not classify by race, alienage, or national origin, will survive an attack based on the Equal Protection Clause if the law is " 'reasonable, not arbitrary' and bears 'a rational relationship to a (permissible) state objective.' " Village of Belle Terre v. Boraas, 416 U.S. 1, 8 (1974). However, land use regulations must possess a legitimate interest in promoting the public health, safety, morals, and the general welfare of its citizens in order to pass scrutiny. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395 (1926) (citation omitted). Land use ordinances will be deemed "irrational" when a plaintiff demonstrates either that the state interest is illegitimate (an ends-focus) or that the chosen classification is not rationally related to the interest (a means-focus).

While the Supreme Court has not yet directly addressed

19

the constitutional incidents of municipal restrictions on use of land by religious institutions,3 its application of the rational basis test in cases involving other alleged liberty restrictions by municipalities exercising land use authority suggests that the same highly deferential standard of review is applicable here. In Village of Euclid , a zoning ordinance classified different portions of land into six categories. The owners of a vacant plot of land that fell partially within a zone restricted to two-family dwellings filed suit claiming that they were being deprived of liberty and property without due process within the meaning of the Fourteenth Amendment. They argued that the land had been held for industrial development, and that under the ordinance the land would be greatly reduced in value since it could not be put to that use.

The Court noted that the case involved the "validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded." 272 U.S. at 390. The Court proceeded by observing the logic of such a design in land use -- that "the segregation of

residential, business, and industrial buildings" would
"increase the safety and security of home life; greatly tend

_____

3. See, e.g., Christian Gospel Church, Inc. v. City of San Francisco, 896
F.2d 1221 (9th Cir. 1990), cert. denied, 498 U.S. 999 (1991) (holding
that denying a permit to establish a church in a residential area did not
violate the Free Exercise Clause because the zoning system protected
government interests, nor did it violate the Equal Protection Clause
because there was no discrimination against appellant); Messiah Baptist
Church v. County of Jefferson, 859 F.2d 820 (10th Cir. 1988), cert.
denied, 490 U.S. 1005 (1989) (holding that denial of a permit to build a
church was not a violation of the Due Process of Free Exercise Clause);
Grosz v. City of Miami Beach, 721 F.2d 729 (11th Cir. 1983), cert.
denied, 469 U.S. 827 (1984) (holding that a zoning law affecting
appellee's ability to conduct religious services in his home was not a
violation of the Free Exercise Clause or the Due Process Clause);
Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of
Lakewood, 699 F.2d 303 (6th Cir.), cert. denied, 104 S.Ct. 72 (1983)
(holding that denial of a variance to build a church in a residential area
was not a violation of the Free Exercise Clause of the Due Process
Clause because it was a legitimate exercise of the city's police power).

to prevent street accidents, especially to children; by
reducing the traffic and resulting confusion in residential
sections; decrease noise and other conditions which
produce or intensify nervous disorders; preserve a more
favorable environment in which to rear children, etc." Id. at
394. Thus, the Court sustained the ordinance as "having [a]
substantial relation to the public health, safety, morals, or
general welfare." Id. The Court further noted that zoning
ordinances should be treated deferentially like other
"practice-forbidding laws," and be upheld even if uses that
"are neither offensive or dangerous will share the same
fate." Id. at 388.

Similarly, the Court upheld against attack the zoning
ordinance in Village of Belle Terre. In that case, the Court
addressed the validity of a zoning ordinance that restricted
a portion of the village to one-family dwellings. The term
"family" was defined to mean individuals related by blood,
adoption, marriage, or living and cooking together as a
single housekeeping unit, but it excluded the latter category
if the household consisted of more than two individuals
who were not related by blood, adoption, or marriage. Six
students attending college at the State University at Stony
Brook, none of whom was related by blood, adoption, or
marriage, brought suit challenging the validity of the
ordinance. The Court observed that the "regimes of
boarding houses, fraternity houses, and the like present
urban problems. More people occupy a given space; more
cars rather continuously pass by; more cars are parked;
noise travels with crowds." 416 U.S. at 9. Thus, the Court
concluded that the ordinance was rationally related to a
legitimate state objective, holding that a "quiet place where
yards are wide, people few, and motor vehicles restricted
are legitimate guidelines in a land-use project addressed to

family needs. . . . It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." Id.

As the foregoing cases make clear, local zoning ordinances are subject to a very forgiving standard of review. That zoning ordinances are subject to such deferential review, however, does not mean that they are subject to no meaningful review. For example, in City of

Cleburne, which we will discuss extensively in Section IV infra, the Court struck down an ordinance requiring group homes for the "feebleminded" to apply for special use permits in the same zone where other groups homes, such as fraternities and homes for the aged, were permitted by right. Applying rational basis review, the Court concluded that the "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary and irrational. Furthermore, some objectives -- such as 'a bare . . . desire to harm a politically unpopular group' -- are not legitimate state interests." City of Cleburne, 473 U.S. at 446-47 (internal citations omitted); see also Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 685 (3d Cir. 1991) (finding "negative attitudes or biases, unfounded fears or speculation, prejudice, self-interest, or ignorance[are] arbitrary and irrational" ends).4

Although a finding of bare animus towards a group or "fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding," is not necessary for a zoning ordinance to fail under an equal protection challenge, such evidence is likely sufficient. City of Cleburne, 473 U.S. at 448. However, absent such animus or

_____

4. Likewise, in Seattle Title Trust Co. v. Roberge, 278 U.S. 116 (1928), the Court struck down a zoning ordinance that permitted a "philanthropic home for children or for old people" in a particular district "when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred feet of the proposed building." Id. at 118. The Court noted that owners could "withhold consent for selfish reasons or arbitrarily and may subject the trustee[owner] to their will or caprice." Id. at 122. Thus, the Court struck down the ordinance because a zoning " 'restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' " Id. at 121 (quoting Nectow v. Cambridge, 277 U.S. 183, 188 (1928)). In that case, Seattle had failed to show how the maintenance and construction of the homes for the aged would "work any injury, inconvenience or annoyance to the community, the district or any person." Id. at 122; see also Hooper v. Barnalillo County Assessor, 472 U.S. 612, 619-20 (1985) (finding legislation not rationally related to purpose of encouraging Vietnam veterans to settle in New Mexico where legislation might have discouraged some veterans from settling there).

other improper motive, a land use ordinance will typically be upheld.

B.

As the preceding more general discussion suggests, the federal courts have given states and local communities broad latitude to determine their zoning plans. Indeed, land use law is one of the bastions of local control, largely free of federal intervention. As the Supreme Court stated in Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68 (1981), "[t]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities.. . . [T]he courts generally have emphasized the breadth of municipal power to control land use . . . ." See also FERC v. Mississippi, 456 U.S. 742, 768 n.30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity."); Izzo v. River Edge, 843 F.2d 765, 769 (3d Cir. 1988) ("Land use policy customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong.").

The breadth of this power, as noted by the Court in Village of Belle Terre, 416 U.S. at 9, "is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." A necessary corollary of the extensive zoning authority bestowed upon local municipalities, including the authority to create exclusively residential districts, is the authority to make distinctions between different uses and to exclude some uses within certain zones. Indeed, zoning is by its very design discriminatory, and that, alone, does not render it invalid.

Concomitantly, in Lakewood, Oh. Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, 699 F.2d 303 (6th Cir. 1983), the Sixth Circuit upheld a zoning ordinance that prohibited the construction of church buildings in virtually all residential districts of the city using rational basis review. When the Congregation of

23

Jehovah's Witnesses was denied a permit to build a church on a plot of land that the Congregation purchased in an area zoned for single-family dwellings, the Congregation filed suit alleging that Lakewood's ordinance, which created areas exclusively for residential use, violated the Free Exercise Clause of the First Amendment. Noting that, under cases such as Village of Euclid and Village of Belle Terre, the city "may, within constitutional limits, zone to preserve a peaceful sanctuary for its citizens," the Sixth Circuit observed that the "broad lines" drawn by the city "to protect its tranquil neighborhoods" were a " 'reasonable margin to insure effective enforcement' of quiet residential zones." Id.

at 308-09. Thus, the Court held that the "ordinance is constitutional although it creates exclusive residential districts and thereby prohibits the construction of church buildings in the districts." Id.

Cases such as Lakewood, as well as Village of Euclid and Village of Belle Terre, demonstrate the breadth of a municipality's power to discriminate in the land use context. Indeed, because the purpose of zoning ordinances is to distinguish among uses in order to draft comprehensive municipal plans, a degree of arbitrariness is inevitable. The question presented in these cases is when does a distinction cross the constitutional line. As long as a municipality has a rational basis for distinguishing between uses, and that distinction is related to the municipality's legitimate goals, then federal courts will be reluctant to conclude that the ordinance is improper.

IV. City of Cleburne and "Similarly Situated" Uses

While City of Cleburne ultimately turned on the fact that the city held an irrational animus toward the mentally retarded, the Court provided a useful roadmap for analyzing equal protection challenges of zoning ordinances. City of Cleburne made two determinations crucial to the outcome in the case: 1) the proposed use, a group home for the mentally retarded, was similarly situated to the allowed uses, other group homes, pursuant to the zoning ordinance, City of Cleburne, 473 U.S. at 447-50; and 2) there was no rational reason behind the differential treatment of the similarly situated uses, id.  at 450, 461,

24

which appears to have been a function of animus against the retarded. Notably, the Court's holding that there was no rational basis for the city's distinction between the CLC and the other permitted uses followed only after the Court determined that CLC and the other permitted uses were "similarly situated." This two-step inquiry properly places the initial burden on the complaining party first to demonstrate that it is "similarly situated" to an entity that it is being treated differently before the local municipality must offer a justification for its ordinance.

Of course, the nature of the issue in City of Cleburne rendered quite easy the determination that CLC was similarly situated to the other permitted uses. The Court was comparing uses that were obviously similarly situated, so that the inquiry into whether the rationale offered by the city -- that the uses would have a different impact -- became the crux of the decision. The Court thus framed the question before it as follows: "May the city require the permit for this facility when other care and multiple-dwelling facilities are freely permitted?" id. at 448; it presumed that it was comparing similar uses. Yet, in answering the question presented, the Court relied on the fact that the impact on CLC would have to be different from the other similar uses, and not just compared with other,

dissimilar uses permitted in the district. The Court noted that the mentally retarded are "different," but that this difference was "largely irrelevant unless the . .. home and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not." Id. (emphasis added). The focus, then, was first and foremost on whether similarly situated uses were being treated differently.

Other courts have tracked the two-step analysis laid out in City of Cleburne, determining first if the uses are "similarly situated" and, if they are, asking if there is a rational basis for distinguishing between them. In Cornerstone Bible Church v. Hastings, supra , the Eighth Circuit relied on City of Cleburne and required the city to provide a rational basis for the "apparent unequal treatment of similarly situated entities" only after first concluding that the church was similarly situated to

25

permitted uses in a commercial zoning district. 948 F.2d at 472. Similarly, in Christian Gospel Church v. San Francisco, 896 F.2d 1221 (9th Cir. 1990), a church sought a permit to build a church in an area zoned for single-family residences. The Court stated that "[i]n order to prevail, the Church must make a showing that a class that is similarly situated has been treated disparately." Id.  at 1225. In concluding that there was no equal protection violation, the Court observed that the church "was treated no differently than a school or community center would have been," and, thus, that the church had failed to establish that other similarly situated uses had been treated differently. Id.

In sum, the first inquiry a court must make in an equal protection challenge to a zoning ordinance is to examine whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone. If, and only if, the entities are similarly situated, then the city must justify its different treatment of the two, perhaps by citing to the different impact that such entities may have on the asserted goal of the zoning plan.

V. Application to the Abington Ordinance

A. The District Court's Approach

As noted above, the Congregation moved for partial summary judgment on the ground that the Ordinance was facially unconstitutional under the Equal Protection Clause and the Due Process Clause. The District Court, however, proceeded to evaluate whether the Ordinance violated the Equal Protection Clause as applied, and did so in order to "avoid making [an] unnecessarily broad constitutional judgment." Congregation Kol Ami, 161 F. Supp.2d at 436.

Relying on City of Cleburne, the District Court concluded that the Ordinance was unconstitutional as applied to the

Congregation because it did not permit the Congregation to apply for a special exception in an R-1 Residential District. As the District Court viewed it, the issue was whether the Township's scheme was rationally related to its proffered reason for excluding the Congregation -- a concern over

traffic, light, and noise pollution. That is, the question was whether it was permissible for the Township to allow uses other than residences in the R-1 Residential District, while simultaneously excluding the Congregation. The District Court observed that Abington's "traffic, noise and light concerns also exist for the uses currently allowed to request a special exception." Id. at 437. Thus, the court concluded that the means employed by the Ordinance, i.e., distinguishing between country clubs and the Congregation, was not rationally related to the goal of preventing traffic, noise, and light pollution in the neighborhood. Accordingly, the court ordered the ZHB to hold a hearing on whether the Congregation was entitled to a special exception.

The Township submits that the District Court erred in its equal protection analysis, for which it relied primarily on City of Cleburne. We agree. First, the District Court failed to make the preliminary determination in the equal protection analysis, as we identified above. See supra Section IV. That is, the District Court failed to inquire whether the uses permitted by special exception, such as country clubs, were "similarly situated" to religious institutions or to the Congregation in particular. Rather, the District Court concluded that because the impact of the uses, either similar or not, was the same, there could be no rational basis for distinguishing between them, and that the Congregation must therefore be able to apply for a special exception.

At oral argument the Congregation claimed that the District Court had focused, and that this Court should focus, on the impact of the different uses because that was the proffered reason offered by Abington for distinguishing between country clubs and religious uses. However, based on our review of City of Cleburne and other caselaw, discussed supra Section III, we conclude that this argument overlooks the fact that Abington need not justify its exclusion of religious uses if such a use is not similarly situated to, for example, a country club. As the Ninth Circuit noted in Christian Gospel Church,"[i]n order to prevail, the Church must make a showing that a class that is similarly situated has been treated disparately." 896 F.2d

at 1225. It is not until this showing is made that it becomes "incumbent on the City to provide a rational basis for [the] apparent unequal treatment of similarly situated entities." Cornerstone, 948 F.2d at 472. That Abington offered a

rationale based on the Congregation's impact does not relieve the Congregation of its burden to demonstrate, at the outset, that it is similarly situated to the uses permitted by special exception in the R-1 District.

So then, the Congregation must demonstrate that it is similarly situated to other permitted entities by demonstrating that it is similarly situated in relation to the Township's purpose in creating the R-1 Residential District. See, e.g., Village of Euclid v. Ambler Realty, 272 U.S. 365, 388 (1926) ("[T]he question whether the power exists to forbid the erection of a building of a particular kind or for a particular use . . . is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality.").

The Township's purpose in creating R-1, as stated in the Ordinance, is to provide "low density single-family, neighborhoods." [1000a]. The burden on the Congregation is to demonstrate that it is just as compatible with this goal as is, for example, a country club. To be sure, it may be that an inquiry into whether something is "similarly situated" will involve an inquiry into whether the two entities have the same impact. But the analysis for equal protection purposes is more nuanced. In City of Cleburne, for example, the nature of the uses was dwellings for large numbers of people. In this case, a court must evaluate not only the impact of the Congregation as compared with a country club, the example raised by the Congregation at oral argument, but also what requirements or needs it may have in order to operate within the neighborhood. Should the Congregation prevail, the burden then shifts to the Township to offer any evidence of a rational reason for distinguishing between the uses.

We will turn presently to the similarity of uses issue. But first we are constrained to note that if we were to conclude, as the District Court did, that all uses with a similar impact must be treated alike, regardless of the fact that such uses

28

may be fundamentally distinct, we would turn zoning law on its head. That is, such a conclusion would mean not only that churches must be allowed in a zone where country clubs are allowed (based on the conclusion that country clubs impact light, traffic and noise as well), but also, by necessity, that a host of other uses that impact light, traffic and noise must also be permitted in such zones. But this would strip of any real meaning the authority bestowed upon municipalities to zone since the broad power to zone carries with it the corollary authority to discriminate against a host of uses that a municipality determines are not particularly suited for a certain district. Placing the burden on the complaining party first to establish that it is similarly situated with other, permitted uses preserves the clearly established local authority in the land use context. The District Court did not do this and

hence its judgment must be set aside. To the extent that the District Court's conclusion rests on the notion that a "house of worship inherently further[s] the public welfare," Congregation Kol Ami, 161 F. Supp.2d at 437, it is seriously problematic for the reasons set forth in the margin. 5

(Text continued on page 31)

---

5. The Congregation concedes that "a municipality may indeed decree that some [uses] are suitable in a particular district and some are not. For example, it could decide that it wishes to permit golf clubs in a residential neighborhood, but exclude tennis clubs." The Congregation also acknowledges that "a local government may generally exclude a use from a residential zone because the use 'lacks residential character,' even if the excluded use would be similarly intense as those permitted." However, the Congregation contends that a local government "may not permit any of those things and prohibit houses of worship and rely on 'compatibility with residential life' as its reason for distinguishing the uses." In its submission, "The Constitution privileges the activity of religious worship at least to this extent: that it bars government from finding nonreligious uses, other than 'residences' themselves, permissible within a residential district, while excluding religious uses for reasons related solely to the 'character' of the activity."

This argument, which is essentially a challenge to the facial validity of the Ordinance under the Equal Protection Clause, is not necessary to our disposition of the case, nor do we think it prudent to pass upon it now; as the District Court noted in ruling on the Ordinance as applied to the Congregation, and as the Supreme Court observed in City of Cleburne, it is preferable, when possible, to "avoid making unnecessarily

29

broad constitutional judgments." City of Cleburne, 473 U.S. at 447; see also Congregation Kol Ami, 161 F. Supp. 2d at 436. However, we do note that this argument seems to boil down to a contention that religious institutions get a preference in the land use context, and we think that such a preference would pose a significant problem.

First, under Employment Div., Dep't of Human Resources of Ore. v. Smith, 494 U.S. 872 (1990), a local government must even-handedly apply its laws and cannot single out religion for either discriminatory or preferential treatment. Id. at 879 ("the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' "). As the Court observed, "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 878-79. Second, a conclusion that religious uses may not be excluded from residential districts takes away the deference that has been granted to local municipalities to make a determination whether or not such a use is suited for a residential district. As stated at oral argument, it creates a "cookie-cutter" approach to zoning that seems contrary to, at the very least, the Supreme Court's observation that "regulation of land use is perhaps the quintessential state activity." FERC v. Missippi, 456 U.S. 742, 768 n.30 (1982).

Second, we are unpersuaded by the Congregation's citation to several decisions in state courts holding that houses of worship are inherently compatible with residential zoning. See, e.g., State v. Maxwell, 617 P.2d 816 (Haw. 1980); Board of Zoning Appeals v. Schulte, 172 N.E.2d 39 (Ind. 1961); Diocese of Rochester v. Planning Bd. of Brighton, 136 N.E.2d 827 (N.Y. 1956); Congregation Committee v. City Council of Haltom City, 287 S.W.2d 700 (Tex. 1956); O'Brien v. Chicago, 105 N.E.2d 917 (Ill. 1952). Although some jurisdictions have so held, not all states espouse this ruling, see, e.g., Seward Chapel, Inc. v. City of Seward, 655 P.2d 1293 (Alaska 1982); Milwaukie Co. of Jehovah's Witnesses v. Mullen, 214 Ore. 281 (1958); West Hartford Methodist Church v. Zoning Bd. of Appeals, 143 Conn. 263 (1956); Miami Beach United Lutheran Church of the Epiphany v. Miami Beach, 82 So.2d 880 (Fla. 1955); Corporation of the Presiding Bishop of the Church of Latter Day Saints v. Porterville, 203 P.2d 823 (Cal. Dist. Ct. App. 1949), nor does the Congregation cite a federal case explicitly upholding this extremely broad principle. Most importantly, although the Pennsylvania Supreme Court has not spoken directly on this subject, lower court decisions demonstrate that it is not good law in Pennsylvania. See, e.g., Church of Our Lord Jesus Christ v.

B. Similarity of Uses

Since we review the grant of (partial) summary judgment de novo, see Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d Cir. 1996), we apply the same standard as the District Court in determining whether summary judgment was appropriate, Michael v. Shiley, Inc., 46 F.3d 1316, 1321 (3d Cir. 1995). Therefore, we may analyze whether the Congregation is similarly situated to uses permitted by special exception in the R-1 Residential District, i.e., whether, as submitted by the Congregation at oral argument, Congregation Kol Ami is similarly situated to a country club. We are tempted to do this because the District Court, albeit in summary fashion, did so, and because delay in disposition of this matter impedes the Congregation's relocation efforts.

In response to questioning at oral argument, the Congregation contends that it is similarly situated to a country club, a use that is permitted by special exception in the R-1 Residential District. In its submission, a country club conducts activities at the same time and with the same number of people as the Congregation would, yet the country club is permitted by special exception but the Congregation is not. The Congregation submits that it should make no difference that "Congregation" Kol Ami, and not "Country Club" Kol Ami, applied for a special exception.

If Abington permitted full-scale country clubs, this argument might have some force. It is unclear however, based on a review of the Abington Ordinance, whether country clubs, as described by the Congregation, are permitted in the R-1 Residential District in Abington. Leaving aside the religious events conducted at the synagogues, which have no analogue to any of the uses

Lower Merion Township, 34 Pa. D. & C.2d 239 (Mont. Co. Ct. of Comm. Pleas 1964) (upholding generally applicable zoning regulation that denied church a special exception to locate in a residential area). At all events, the U.S. Supreme Court's holding in Smith renders questionable the continuing vitality of this line of state cases for the reasons discussed above.

permitted in R-1 by special exception, the country club described at oral argument was one that would be on a par with a 450-family synagogue regularly hosting weddings and Bar and Bat Mitzvah services.[OA Trans. At 62, 68, 93]. But we cannot tell whether the Ordinance would permit such a club. The R-1 Residential District permits "Outdoor Recreation" by special exception.[1001a]. Outdoor recreation is then defined as follows:

> Public or private miniature golf courses, swimming pools, ball courts, tennis courts, ball fields, trails, and similar uses which are not enclosed in buildings and are operated on a commercial or membership basis, primarily for the use of patrons who do not reside on the same lot on premises. Outdoor recreation shall include any accessory use, such as snack bars, pro shops, club houses, country clubs, or similar uses which are designed and intended primarily for the use of patrons of the principal recreational use. Outdoor recreation shall not include amusement parks, open space recreational uses, overnight camping parks, or other uses specifically provided herein.

(Emphasis added). [1098a].

This ordinance is not a model of clarity, but its text does not appear to permit full-scale country clubs. While "country clubs" are permitted within the meaning of "outdoor recreation," when read in connection with the permitted "outdoor recreation" it seems that country clubs like those envisioned by the Congregation are not permitted. For example, the use permits miniature golf courses, not full-scale golf courses, which is a limitation that seems to restrict the possibility that any grand country club could or would locate in the R-1 Residential District. Rather, under the text of the Ordinance the type of country club permitted in the R-1 Residential District appears specifically designed to be an accessory use and, as such, to serve those uses listed in the sentence preceding the list of accessory uses, such as miniature golf courses, swimming pools, and tennis courts. Under this reading, the Congregation's argument that such clubs could be used for

weddings and other celebrations would be inconsistent with the precise language of the Ordinance.6

But this argument, which depends on a rather crabbed characterization of "country club," is less than fully convincing. At all events, because the ordinance is so poorly written that we cannot be sure what it means, we will remand so that the District Court can consider the similarity issue in the first instance. In consideration of this remand, we make a number of observations for the guidance of the District Court.

First, we note that of the uses permitted by special exception in the R-1 Residential District, the country club comparison seems to be the only possible similarity. 7 We are mindful that in City of Cleburne, the different housing arrangements used for comparison were, essentially, multiple housing arrangements. It is hard to describe how one of the arrangements differed from the other insofar as its use was concerned. Clearly, as the similarity of use wanes, so too the inequality in treatment will be increasingly tolerated under the law. On the basis of the present record, it seems doubtful that the Congregation is similarly situated to the other uses permitted by special exception in R-1. Kennels, riding academies, and outdoor recreation facilities are very low-intense uses of land that preserve residential character. [1074a-75a, 1098a]. Train

---

6. We note, in this regard, that restaurants and clubs in general are not permitted either by right or by special exception in the R-1 Residential District. Rather, restaurants are permitted only in commercial districts, such as in the Town Commercial District [1007a], Special Commercial District [1010a], Planned Business Districts[1014a], Mixed Use Districts [1028a], and as an accessory use to a golf course [1097a]. "Clubs" are permitted in the Apartment-Office Districts [1018a], Mixed Use Districts [1028a], and Recreation/Conservation Districts[1036a]. Country clubs of the type conceived of by the Congregation, with full-scale golf courses, are permitted in the Community Service Districts by conditional use permit (where houses of worship are permitted by right), Apartment-Office Districts, and Recreational/Conservation Districts by special exception. [1019a, 1036a].

7. Although the notion that a country club and a synagogue are similarly situated at first seems counterintuitive, perhaps an explanation (beyond similarity of impacts) can be found.

33

stations and bus shelters are located adjacent to (usually long established) public rights of way which transport suburban commuters into Philadelphia and support regional transportation. [1108a]. Municipal complexes, emergency services, and utility facilities for sewers and electricity are indispensable to the health, safety, and administration of a residential community [1094a, 1108a]. All of these uses would appear to have functionally different purposes than the Congregation, and would seem compatible with a low-density residential neighborhood so as to represent a lower likelihood of generating negative secondary effects.

In addition to the fact that the uses permitted by right or by special exception differ in scale and purpose from the Congregation, we note that the Congregation's proposed use presents an intense use of the land, which the Township might determine was incompatible with its residential designation. Services and educational classes typically require a large number of people to arrive and leave by car at roughly the same time. As we previously observed, a municipality may chart out a "quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. . . . The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where . . . the blessings of quiet seclusion and clean air make the area a sanctuary for people." Village of Belle Terre, 446 U.S. at 9.

As represented at oral argument by the Township, the Congregation stated at the initial proceeding before the ZHB that it had a membership of 207 families and predicted a growth to about 350 families. By the time the special exception hearing was held, the Congregation was willing to put a cap at 450 families. There is no doubt that the Congregation is growing, probably due to a popular rabbi. The Congregation may well grow larger. With a large and growing congregation comes increased traffic and noise. Indeed, at the special exception hearing, the Congregation reported that it would need to expand the existing parking lot to 137 spaces, but might need to make available an additional 54 spaces for reserve parking for heavy-use

occasions. [3904a]. This matter might well be considered by the District Court on remand.

C. Rationality

Since we remand for resolution of the similarity of uses issue, we need not reach the ultimate rationality question, even though the District Court did so. We do however, offer some observations on that issue should the District Court need to revisit it.

First, we note that there is no evidence of anti-Jewish or anti-religious animus in the record. Although such evidence is not necessary to sustain an equal protection violation, this court has stated that "negative attitudes or biases, unfounded fears or speculation, prejudice, self-interest, or ignorance [are] arbitrary and irrational" ends that warrant finding a statute unconstitutional. Midnight Sessions, 945 F.2d at 685.

Second, the facts of this case illustrate why religious uses may be, in some cases, incompatible with a place of "quiet seclusion." When conducting its Comprehensive Plan in 1992, the Township determined that institutional uses, such as schools, churches, and hospitals, have distinctive requirements that would best be addressed by placing them

in particular districts. Specifically, the Township concluded that although these entities "provide many benefits to the community," they also "have specific use, space and locational requirements which are inherently different from other land categories . . . [and] necessitate[ ] a separate land use classification." [889a]. To that end, the CS-Community Service District was established to meet the particular needs of churches and other institutions. [1024a].

In view of the enormously broad leeway afforded municipalities in making land use classifications, see discussion supra, it is strongly arguable that the Township's decision to group churches together with schools, hospitals, and other institutions is rationally related to the needs of these entities, their impact on neighboring properties, and their inherent compatibility or incompatibility with adjoining uses. If so, the foregoing

35

standard of review in land use cases will be met. Such planning is the raison d'etre of zoning ordinances, and broad latitude is given to authorities that rationally conduct this municipal function. See Euclid, 272 U.S. at 388-89 ("The inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity.").

Finally, we do not believe land use planners can assume anymore that religious uses are inherently compatible with family and residential uses. See, e.g., Megachurches as Minitowns, NYT F1, F6 (May 9, 2002). Churches may be incompatible with residential zones, as they "bring congestion; they generate traffic and create parking problems; they can cause a deterioration of property values in a residential zone . . . ." Jewish Reconstructionist Synagogue v. Village of Roslyn Harbor, 38 N.Y.2d 283, 293 (1975). Thus, the District Court must refrain from making a blanket determination that religious institutions are inherently compatible, and, as argued by the Congregation, "essential to residential zoning." See supra n.5. These matters need to be considered on remand as well.

D. Conclusion

For the foregoing reasons, the judgment and order of the District Court will be vacated and the case remanded for further proceedings consistent with this opinion. The special exception granted by the ZHB and the land use permit issued by the Township are declared to be null and void. Parties to bear their own costs.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit