# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-4030

CIVIL LIBERTIES FOR URBAN BELIEVERS,
CHRIST CENTER, CHRISTIAN COVENANT
OUTREACH CHURCH, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 6151—**William J. Hibbler**, *Judge.*

ARGUED JANUARY 17, 2003—DECIDED AUGUST 20, 2003

Before BAUER, POSNER, and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Appellants, an association of
Chicago-area churches and five individual member churches
thereof, appeal from the district court's entry of summary
judgment in favor of Appellee, the City of Chicago, on Ap-
pellants' claims challenging the Chicago Zoning Ordinance
("CZO"), 17 MUNICIPAL CODE OF CHICAGO, ILL., §§ 1-11,
under the federal Religious Land Use and Institutionalized
Persons Act ("RLUIPA"), 42 UNITED STATES CODE § 2000cc
*et seq.*, and the United States Constitution. For the reasons
set forth below, we affirm the decision of the district court.

## BACKGROUND

The CZO broadly divides the city into R, B, C, and M zones for residential, business, commercial, and manufacturing uses, respectively. Each zone, in turn, is subdivided into numbered districts and subdistricts. A majority of Chicago land available for development is zoned R. The CZO's stated purposes include the following: (i) "to promote and to protect the public health, safety, morals, comfort, convenience, and the general welfare of the people," and (ii) "to protect the character and maintain the stability for residential, business, commercial, and manufacturing areas within the City, and to promote the orderly and beneficial development of such areas." *See* 17 MUN. CODE CHI. § 2 (1), (3) (2001). Churches are permitted uses as of right in all R zones, but are termed Variations in the Nature of Special Uses ("Special Use") in all B zones as well as C1, C2, C3, and C5 districts. All Special Uses, whether of a religious or nonreligious nature, require approval by the Zoning Board of Appeals ("ZBA") following a public hearing. *See id.* §§ 7.3-1(4), 8.4, 9.4, & 11.10. Special Use approval is expressly conditioned upon the design, location, and operation of the proposed use consistent with the protection of public health, safety, and welfare, and the proposed use must not substantially injure the value of neighboring property. *See id.* § 11.10-4. Factoring such expenses as application, title search, and legal fees, as well as appraisal and neighbor notification costs, the aggregate cost of obtaining Special Use approval approaches $5000. Before a church may locate in a C4 district or an M zone, the Chicago City Council must vote in favor of a Map Amendment, effectively rezoning the targeted parcel. *See id.* §§ 9.4-4, 10, & 11.9. Development for church use of land consisting of two or more acres (necessary for congregations exceeding roughly 500 members) requires approval by City Council vote of a Planned Development. *See id.* § 11.11-1(a) & 11.11-3.

Civil Liberties for Urban Believers ("CLUB") is an unincorporated association of 40 to 50 Chicago-area religious or not-for-profit Illinois corporations ranging in size from 15 to 15,000 congregants. Five of these individual member churches[1] joined CLUB as plaintiffs in an action challenging the validity of the CZO. The district court summarized as follows the encounters of the five individual plaintiff churches with Chicago's zoning framework as alleged in Appellants' complaint:

Christ Center began meeting in a high school auditorium in 1990, but soon experienced difficulties at this location due to various school functions that interrupted weekly worship. As a result, Christ Center began searching for a building to purchase. The church was unsuccessful in locating an appropriate building in any R districts. In the summer of 1992, Christ Center located a suitable building at 1139-43 West Madison in Chicago. The building was located in a C district and Christ Center promptly applied for a special use permit. After completing the application process, Christ Center reached out to gain the support of neighbors and Alderman Theodore Mazola. Most neighbors favored a taxpaying entity in the neighborhood rather than a church and Alderman Mazola stated that he would support the church's special use permit on any street but Madison. The Zoning Board eventually convened a special hearing on September 18, 1992. On October 18, 1992, the special use permit was denied. Christ Center subsequently found a second building in an M district at 123 South Morgan. The owner of the building also agreed to provide financing. However, the Chicago

---

[1] Those five Churches are (i) Christ Center; (ii) Christian Covenant Outreach Church ("Christian Covenant"); (iii) His Word Ministries to All Nations ("His Word"); (iv) Christian Bible Church ("Christian Bible"); and (v) Monte de Sion Church ("Mount Zion").

Department of Planning and Development informed Christ Center that it would oppose any rezoning application because the particular area was designated to become an entertainment area and the presence of a church would inhibit such development. Christ Center subsequently choose not to file an application for rezoning. In the fall of 1993, Christ Center obtained property at 4445 South King Drive, successfully obtained a special use permit and now operates a church at this location. Christ Center now claims that it paid substantial sums in attorneys fees, appraisal fees, zoning application charges, title charges and other expenses attempting to find suitable property.

Between 1986 and the summer of 1988, Christian Bible met in a private home. The church eventually outgrew this space and began meeting in a funeral home. The funeral home, however, proved aesthetically and administratively problematic. In 1990, Christian Bible located a suitable building in a B district at 83rd and Essex. Alderman Beavers promptly informed Christian Bible that "he would not allow" a church at that location. Consequently, Christian Bible did not apply for a special use permit at this location. In March 1991, Christian Bible purchased property in another B district at 513-23 East 75th Street. The Park Manor Neighbors Association and Alderman Steele both opposed the church's special use permit application. On May 17, 1991, the permit was denied. Christian Bible then unsuccessfully attempted to sell the building for 10 months. In February 1992, Christian Bible renovated the building to enhance its appearance. During these renovations, the church rented space at another location, or held meetings at private homes. Christian Bible later reapplied for a special use permit which was granted on August 20, 1993 with the support of neighbors in the district. Christian Bible now claims the

delay in obtaining a special use permit prevented the church from obtaining a real estate tax exemption. The church further alleges that it also paid substantial sums in expenses related to the application process and also suffered a decrease in membership. Christian Bible now owns and meets at a church at 6210 S. St. Louis and has successfully obtained a special use permit to operate the church.

From February, 1988 to December, 1993, Mount Zion rented space in a C district at 4545 North Kedzie. During this period, Mount Zion never applied for a special use permit. In 1990, a [Chicago] inspector ordered Mount Zion to vacate the building. In April 1993, Mount Zion located suitable rental property at 3949 North Pulaski, and applied for a special use permit. During this process, the Zoning Board informed Mount Zion that the building lacked adequate parking accommodations for a church and both the building and each parking lot would require special use permits. Alderman Wojcik and a neighborhood group also opposed Mount Zion's application. Consequently, Mount Zion withdrew its application for a special use permit. Mount Zion now owns and meets in a church at 3807 N. Lavergne.

On November 1, 1992, Christian Covenant first rented property in a C district. The owner of the building offered to co-sign a loan enabling Christian Covenant to purchase the property. However, [Chicago] inspectors ordered Christian Covenant to stop using the building as a church without a special use permit. As a result, Christian Covenant did not purchase the building out of fear [Chicago] would not allow the building to be used as a church without a special use permit. Christian Covenant now owns and meets in a church located in an R district.

Between 1990 and 1992, His Word met in the basement of a private home until membership outgrew these accommodations. In 1992, His Word located a suitable building in a C district at 1616 West Pershing. On March 27, 1992, the church signed a purchase contract contingent upon the grant of a special use permit. After filing their special use permit application, His Word met with neighbors in the district who generally supported it. Alderman Patrick Huels stated he would neither support nor oppose the application. On three separate occasions, at the request of Alderman Huels, the [ZBA] postponed a hearing on His Word's application. On October 14, 1992, Alderman Huels introduced an amendment to the [CZO] to rezone the property located at 1616 West Pershing from a C district to an M district. After a hearing on December 10, 1992, Alderman William Banks and other aldermen on the Chicago Committee on Zoning of the Chicago City Council voted to recommend approval of the amendment. Both His Word and Citibank, the owner of the building, opposed the rezoning. On December 15, 1992, the Chicago City Council voted to enact the rezoning amendment changing 1616 West Pershing from a C district to an M district. His Word subsequently withdrew its application for a special use permit; the church spent a considerable sum on filing, attorney's and appraiser's fees. His Word now owns and meets in a church located in an R district.

*Civil Liberties for Urban Believers v. Chicago*, 157 F.Supp.2d 903, 907-08 (N.D. Ill. 2001).

This appeal from the district court's summary judgment ruling in favor of Chicago on Appellants' fourth amended complaint reaches us via a long and tortuous procedural

path.[2] Appellants amended their original complaint to remove claims challenging the CZO under the federal Religious Freedom Restoration Act, 42 U.S.C. 2000bb *et seq*. ("RFRA"), after the Supreme Court invalidated relevant provisions of RFRA in *City of Boerne v. Flores*, 521 U.S. 507 (1997). In February 2000, in response to Appellants' remaining constitutional challenges to the CZO's designation of churches vis-à-vis various nonreligious assembly uses in B, C, and M zones, the City Council amended the CZO to require clubs, lodges, meeting halls, recreation buildings, and community centers to obtain Special Use approval in order to locate within any B and C zones and a Map Amendment in order to locate within any M zone. The amendments also (i) exempt churches from the requirement that a Special Use applicant affirmatively demonstrate that the proposed use "is necessary for the public convenience at that location" and (ii) provide that a Special Use permit shall automatically issue in the event that the ZBA fails to render a decision within 120 days of the date of application. Several months thereafter, Congress reacted to the Supreme Court's decision in *City of Boerne* with the enactment of RLUIPA and Appellants subsequently amended their complaint once more to include claims against Chicago pursuant to RLUIPA.[3]

---

[2] The procedural history includes an opinion of this Court holding that legislative immunity shields Chicago Aldermen William Banks and Patrick Huels from any liability arising out of their zoning-related actions. Plaintiffs Ira Iglesia de la Biblia Abierta and His Word sought to hold the aldermen personally liable for alleged civil rights violations resulting from the aldermen's introduction of legislation intended to rezone 1616 West Pershing Road, effectively preventing its use as a church. *See Iglesia de la Biblia Abierta v. Banks*, 129 F.3d 899 (7th Cir. 1997); and *Civil Liberties for Urban Believers*, 157 F.Supp.2d at 908.

[3] Noting that the district court's opinion narrates more thoroughly the procedural history of this case, *see* 157 F.Supp.2d at

(continued...)

In addition to the RLUIPA claim, Appellants' final amended complaint argued, in part, that the CZO and the administrative and legislative processes for obtaining Special Use, Map Amendment, and Planned Development approval violate Appellants' rights to (i) free exercise of religion, speech, and assembly under the First Amendment of the United States Constitution, (ii) equal protection under the Fourteenth Amendment of the United States Constitution as well as the Illinois Constitution, and (iii) procedural due process under the Fourteenth Amendment of the United States Constitution. Appellants also claimed that the rezoning of 1616 West Pershing Road ("Pershing") violated His Word's constitutional rights.[4]

In granting summary judgment in favor of Chicago, the district court determined that the February 2000 amendments to the CZO removed "any potential substantial burden" on religious exercise, such that Chicago

> avoid[ed] the preemptive force of any provision of [RLUIPA] by changing the policy or practice that result[ed] in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminate[ed] the substantial burden.

42 U.S.C. § 2000cc-3(e). With respect to Appellants' equal protection claims, the district court concluded that Chicago's zoning scheme is rationally related to a legitimate

---

[3] (...continued)
905-08, we limit our opinion to include only those procedural details directly relating to our disposition of this appeal.

[4] Pursuant to 28 U.S.C. § 1367(c), the district court dismissed without prejudice Appellants' claim under the Illinois Religious Freedom Restoration Act, 775 ILL. COMP. STAT. § 35/15.

government purpose and thus constitutional. The district court also rejected Appellants' due process claims, noting that City Council and ZBA legislative procedures and practices afforded Appellants what minimal process is due in zoning cases. In its discussion of Appellants' First Amendment claims, the district court explained that the CZO and its Special Use provisions are neutral and generally applicable law which do not impermissibly burden the free exercise of religion, and that the operation of a church is subject to zoning laws, even where such operation involves conduct within the core of the First Amendment—here, religious speech and assembly. Finally, while acknowledging that the conduct of Alderman Huels in connection with the Pershing rezoning was "egregious" and perhaps "dishonorable", the district court relied on this Court's decision in *Biblia Abierta*, 129 F.3d at 901-02, to conclude that such legislative action was constitutional insofar as it (i) afforded His Word procedural due process, (ii) was taken subject to neutral and generally applicable ordinances, and (iii) was rationally related to Chicago's legitimate interests in developing the commercial areas adjacent to the parcel while avoiding land-use conflicts.

The district court subsequently denied Appellants' motion, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure ("FRCP"), to reconsider its summary judgment. *See Civil Liberties for Urban Believers v. Chicago*, No. 94 C 6151 (N.D. Ill. Mar. 29, 2002). This appeal ensued.

## ANALYSIS

We review the district court's grant of summary judgment de novo. *See, e.g., Freedom of Religion Foundation v. Bugher*, 249 F.3d 606, 610 (7th Cir. 2001). Summary judgment is proper where there is no genuine issue as to any material fact. Such is the case where the nonmoving party has failed to make a sufficient showing on an essen-

tial element of his case with respect to which he has the burden of proof, because a complete failure of proof concerning an essential element of his case necessarily renders all other facts immaterial. In such a case, the moving party is entitled to judgment as a matter of law and summary judgment must issue against the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); FED. R. CIV. P. 56(c).

## I. *Religious Land Use and Institutionalized Persons Act*

Appellants argue that the CZO violates RLUIPA's substantial burden provision, which requires land-use regulations that substantially burden religious exercise to be the least restrictive means of advancing a compelling government interest, *see* 42 U.S.C. § 2000cc(a), as well as its nondiscrimination provision, which prohibits land-use regulations that either disfavor religious uses relative to nonreligious uses or unreasonably exclude religious uses from a particular jurisdiction, *see* 42 U.S.C. § 2000cc(b).[5]

---

[5]  In relevant part, those provisions read as follows:

§ 2000cc. Protection of land use as religious exercise.

  (a) Substantial burdens.

    (1) General rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

      (A) is in furtherance of a compelling governmental interest; and

      (B) is the least restrictive means of furthering that compelling governmental interest.

(continued...)

In order to prevail on a claim under the substantial burden provision, a plaintiff must first demonstrate that the regulation at issue actually imposes a substantial burden on religious exercise. RLUIPA defines "religious exercise" to encompass "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," including "[t]he use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7). This definition reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions

---

[5] (...continued)

> (2) Scope of application. This subsection applies in any case in which. . .
>
>> (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.
>
> (b) Discrimination and exclusion.
>
>> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
>>
>> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
>>
>> (3) Exclusions and limits. No government shall impose or implement a land use regulation that—
>>
>>> (A) totally excludes religious assemblies from a jurisdiction; or
>>>
>>> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc.

discussing the precursory RFRA, *see, e.g., Hicks v. Garner*, 69 F.3d 22, 26 n. 22 (5th Cir. 1995) (collecting cases defining "substantial burden on religious exercise" under RFRA), and in traditional First Amendment jurisprudence, *see, e.g., Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989) (religious exercise as "the observation of a central religious belief or practice" (citations omitted)); *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718, (1981) (religious exercise as behavior and beliefs compelled by a particular religion); *Sherbert v. Verner,* 374 U.S. 398, 404 (1963) (religious exercise as adherence to the central precepts of a religion). Although the text of the statute contains no similar express definition of the term "substantial burden," RLUIPA's legislative history indicates that it is to be interpreted by reference to RFRA and First Amendment jurisprudence. *See* 146 CONG. REC. 7774-01, 7776 ("The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise"). Chicago cites a decision of this Court which held that, within the meaning of RFRA, a substantial burden on religious exercise "is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996) (vacated on other grounds). Substituting RLUIPA's broader definition of religious exercise, which need not be "compelled by or central to" a particular religion, for that articulated in *Mack*, the meaning of "substantial burden on religious exercise" could be read to include the effect of any regulation that "inhibits or constrains the use, building, or conversion of real property for the purpose of religious exercise." Such a construction might lend support to Appellants' contention that the CZO, insofar as it contributes to other existing constraints upon the use of specific parcels as

churches, substantially burdens religious exercise. However, this cannot be the correct construction of "substantial burden on religious exercise" under RLUIPA. Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word "substantial," because the slightest obstacle to religious exercise incidental to the regulation of land use—however minor the burden it were to impose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means. We therefore hold that, in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable.

Appellants contend that the scarcity of affordable land available for development in R zones, along with the costs, procedural requirements, and inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes, impose precisely such a substantial burden. However, we find that these conditions—which are incidental to any high-density urban land use—do not amount to a substantial burden on religious exercise. While they may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago. *See, e.g., Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990) ("Whatever specific difficulties [plaintiff church] claims to have encountered, they are the same ones that face all [land users]. The harsh

reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them"). Significantly, each of the five individual plaintiff churches has successfully located within Chicago's city limits. That they expended considerable time and money so to do does not entitle them to relief under RLUIPA's substantial burden provision. *See, e.g., Stuart Circle Parish v. Board of Zoning Appeals of Richmond,* 946 F. Supp. 1225, 1237 (E.D. Va. 1996) ("It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'") (quoting *Braunfeld v. Brown,* 366 U.S. 599, 605, (1961) (plurality opinion)). Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. Unfortunately for Appellants, no such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.

Though the substantial burden and nondiscrimination provisions are operatively independent of one another, RLUIPA's governmental discretion provision, 42 U.S.C. § 2000cc-3(e), upon which the district court relied in order to find that the February 2000 CZO amendments corrected any violation of the substantial burden provision, appears not to reflect this distinction. That subsection provides, in part, that "a government may avoid the preemptive force of *any provision* of [RLUIPA] by changing the policy or practice *that results in a substantial burden* on religious exercise." 42 U.S.C. § 2000cc-3(e) (emphasis added). Rather than remove any substantial burden on religious exercise, however, the February 2000 amendments simply place churches on an equal footing with nonreligious assembly uses, thereby correcting any potential violation of the

nondiscrimination provision. Despite subsection 2000cc-3(e)'s reference to removal of a "substantial burden," we read it to afford a government the discretion to take corrective action to eliminate a nondiscrimination provision violation, whether or not it was the result of a substantial burden on religious exercise. Thus do we find that, under RLUIPA's governmental discretion provision, the February 2000 amendments to the CZO render RLUIPA's nondiscrimination provision inapplicable to this case.[6]

Insofar as Appellants cannot demonstrate on these facts that the CZO substantially burdens religious exercise, and because the February 2000 Amendments to the CZO bring it into compliance with RLUIPA's nondiscrimination provision, Appellants fail to make a sufficient showing on essential elements of their RLUIPA claims. Chicago is therefore entitled to summary judgment on those claims.

Having found RLUIPA inapplicable to the facts of this case, we need not address the issue of RLUIPA's constitutionality, raised by the parties as well as the United States of America, as Intervenor, and various Amici Curiae.

---

[6] Appellants also challenge the district court's ruling that their claims under the pre-2000 CZO are moot. They claim that churches, like other nonreligious assembly uses, should have been permitted uses in all zones, in which case plaintiff churches would not have been subject to Special Use approval procedures. They allege damages resulting from the costs associated with these procedures. This argument ignores the fact that the primary effect of the 2000 amendments was to impose similar restrictions on non-religious assembly uses, rather than to relax restrictions on churches. Appellants cannot demonstrate that the amended CZO recognizes any preexisting right of churches to operate in B, Z, or M zones. The amendments simply place restrictions on nonreligious assembly uses that are similar to or greater than those facing religious uses. As such, the district court correctly concluded that Appellant's pre-2000 CZO claims are moot.

*II. Constitutionality of the Chicago Zoning Ordinance*

Under the Free Exercise Clause of First Amendment of the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment, no law may prohibit the free exercise of religion. Prior to RLUIPA's enactment, two Supreme Court decisions held that no Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest. *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). Appellants cite *Smith* and *Hialeah* as additional authority for application of the compelling governmental interest and least restrictive means tests to the CZO, not unlike those urged under RLUIPA.

Appellants first argue that the CZO lacks facial neutrality because, like the law at issue in *Hialeah*, the CZO "refers to a religious practice"—use of property as a church—"without a secular meaning discernable from the language or context." 508 U.S. at 530. In that case, the City of Hialeah reacted to the intention of practitioners of the Santería religion to establish a church within city limits by passing ordinances banning public ritual sacrifice, a distinguishing element of the Santería religious tradition. The Court explained that a law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation," and then found that the *Hialeah* ordinances' use of the words "sacrifice" and "ritual", which have "strong religious connotations," was evidence of their purposeful targeting of Santería practices. Appellants assert by analogy that the CZO's explicit inclusion of "church" among the various land uses it regulates indicates that it discriminates against churches on its face. Unlike the *Hialeah*

ordinances, however, the text of the CZO includes "church" as just one among many and varied religious and nonreligious regulated uses.[7] More importantly, nothing in the record suggests, nor do Appellants articulate in anything but conclusory terms, that the object and purpose of the CZO are anything other than those expressly stated therein. *See* 17 MUN. CODE CHI. § 2.

In addition to their facial challenge under the Free Exercise Clause as interpreted in *Hialeah*, Appellants allege that the CZO was not neutrally applied to His Word during the course of Alderman Huels' successful efforts to initiate the rezoning of 1616 West Pershing Road.[8] While they concede that Alderman Huels may not be held personally liable for his actions based on our decision in *Biblia Abierta*, 129 F.3d at 901-02, Appellants argue that his actions were legislative acts which improperly targeted His Word. However,

> [m]unicipal liability attaches only where the decisionmaker possesses final authority to establish

---

[7] The variety of regulated uses specifically referenced in the text of the CZO can be gleaned from the following non-exhaustive list of examples: dwellings, nurseries, rectories, parish houses, golf courses, libraries, convents, monasteries, schools, parks, playgrounds, day care centers, hospitals, clubs, lodges, restaurants, wireless communications facilities, cemeteries, parking lots, hotels, photography studios, pet shops, fraternity houses, museums, correctional institutions, tattoo parlors, pawn shops, taverns, kiddie parks, inter-track wagering facilities, earth station antennas, frozen food lockers, live bait stores, banks, barbershops, and paint pellet arenas.

[8] In a single sentence, Appellants also allege due process and equal protection violations as a result of the rezoning of 1616 West Pershing Road. Though it is difficult even to evaluate claims offered in terms as conclusory as these, we find them meritless for the same reasons that we are unmoved by Appellants' Free Exercise claims.

> municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.

*Pembaur v. Cincinnati*, 475 U.S. 469, 481-82 (1986). Here, the possibility that Alderman Huels' motives for wanting to have the property rezoned were illicit in no way demonstrates that the City Council and the Mayor, who have final authority under state law to enact city ordinances, *see* 65 I.L.C.S. §§ 5/1-2-1(2), endorsed any such motives. Absent some evidence that the policy-making body, in this case the City Council, approved both the rezoning *and* the illicit motivation therefor—and Appellants offer none—Chicago cannot be held liable for Alderman Huels' actions. *See, e.g., City of St. Louis v. Prapotnik*, 485 U.S. 112, 128-30 (1988) (plurality opinion); *id*. at 140-42 (Brennan, J., concurring in the judgment).

Appellants also contend that the CZO is not generally applicable, in that the Special Use, Map Amendment, and Planned Development processes create discretionary, individualized exemptions to the CZO which are then impermissibly withheld from churches. As support for this proposition, they cite the Supreme Court's pronouncement that "[i]n circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of "religious hardship" without compelling reason.'" *Hialeah*, 508 U.S. at 537 (*quoting Smith*, 494 U.S. at 844 (citation omitted)). Even assuming, *arguendo*, that the burdens incidental to churches seeking Special Use, Map Amendment, or Planned Development approval amount to "religious hardship" within the meaning of the Court's decision in *Hialeah*, Appellants appear to confuse exemption from a particular zoning provision (in the form of Special Use, Map Amendment, or Planned Development approval) with exemption

from the procedural *system* by which such approval may be sought. Under the CZO, these alternate avenues of zoning approval are not merely *available* to any would-be applicant, as *Hialeah* requires. They are mandatory. In short, no person, nor any nonconforming land use, is exempt from the procedural system in place for Special Use, Map Amendment, or Planned Development approval specifically, or the CZO generally. Furthermore, the experiences of plaintiff churches Christ Center and Christian Bible, each of which was initially denied—and subsequently granted—Special Use approval, demonstrates that Chicago has extended Special Use exemptions to churches. It is clear to this Court that it is neither the policy nor the practice of Chicago to refuse to extend to churches its system of individualized exemptions and, thus, that the CZO is a generally applicable system of land-use regulation.

In *Smith*, the Supreme Court noted that, in cases implicating the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and freedom of association, the First Amendment may subject the application to religiously motivated action of a neutral, generally applicable law to a heightened level of scrutiny. *Smith*, 494 U.S. at 881-82. Seizing upon this principle, Appellants maintain that their Free Exercise claim involves hybrid rights of free exercise, freedom of speech, freedom of assembly, and equal protection, such that Chicago must justify the CZO's incidental burdens on church location with a compelling state interest. Based on the analyses of Appellants' speech, assembly, and equal protection claims that follow, however, we find them individually lacking the merit necessary to withstand summary judgment. We agree with the Court of Appeals for the Ninth Circuit that "a plaintiff does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." *Miller v. Reed*, 176 F.3d 1202, 1207-08 (9th Cir. 1999). *Accord, e.g., Swanson v.*

*Guthrie Independent School District*, 135 F.3d 694, 700 (10th Cir. 1998); *Brown v. Hot, Sexy, and Safer Products, Inc.*, 68 F.3d 525, 539 (1st Cir. 1995); *Kissinger v. Board of Trustees*, 5 F.3d 177, 180 (6th Cir. 1993). Appellants have identified no constitutionally protected interest upon which the CZO infringes, as they must in order to establish a hybrid rights claim requiring heightened scrutiny.

Of Appellants' remaining constitutional claims, the first alleges that the CZO violates Appellants' First Amendment rights to freedom of speech and freedom of assembly because the CZO is neither (i) content neutral nor (ii) narrowly tailored to serve a legitimate governmental objective and (iii) does not leave open ample channels of alternative communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 782 (1989) (articulating these three criteria for valid time, place, and manner restrictions on speech and assembly). Appellants state in conclusory terms that the CZO discriminates against religious uses, is "irrational and arbitrary," restricts churches to R zones, and is not narrowly tailored. They also state that the CZO's requirement that churches occupying more than two acres obtain Planned Development approval creates a practical ban on large churches. As discussed previously, the CZO is neutral and generally applicable and places churches on a footing equal with, if not superior to, that of nonreligious assembly uses. Similarly, to the extent that the CZO incidentally regulates speech or assembly within churches, such regulation is motivated not by any disagreement that Chicago might have with the message conveyed by church speech or assembly, but rather by such legitimate, practical considerations as the promotion of harmonious and efficient land use. In this respect it is content neutral. In order to satisfy the requirement that it is narrowly tailored, "a regulation need not be the least restrictive or least intrusive means." *Ward*, 491 U.S. at 798. It need only further "a substantial government interest that would be achieved less effectively absent the regulation." *Id*. at 799. There is no

question that Chicago—like any population center—has a substantial interest in regulating the use of its land and that the CZO promotes that interest. We are also unpersuaded by Appellants' implicit suggestion that the restriction of church use as of right to R zones leaves churches with insufficient channels of communication. Not only may churches freely disseminate religious speech in a majority of Chicago land zoned for development, but they may also disseminate—and, in the cases of plaintiffs Christ Center and Christian Bible, have in fact disseminated—religious speech in B and various C districts with Special Use approval. Similarly, the Planned Development approval process provides larger churches with ample opportunity to locate within Chicago in a manner consistent with the CZO's legitimate, stated purposes. For these reasons, Appellants' First Amendment freedom of speech and freedom of assembly claims are without merit.

Appellants further argue that the CZO violates the Equal Protection Clause of the Fourteenth Amendment—which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws"—by treating churches in a manner less favorable than that of nonreligious assembly uses. It is the well established law of this Circuit that, "[a]bsent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land use context, a plaintiff must demonstrate governmental action wholly impossible to relate to legitimate governmental objectives." *Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2001); *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (unless a statute classifies by race, alienage, or national origin or impinges on fundamental constitutional rights, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest"). Appellants urge us to elevate the level of scrutiny under which we review their equal protection claim against the CZO

because the regulation of a church's use of land necessarily implicates the fundamental right of freedom of religious exercise. As a preliminary matter, we are quick to reiterate our earlier determination that any burdens on religious exercise imposed by the CZO are both incidental and insubstantial. Furthermore, this court has held that the fundamental rights theory of heightened equal protection scrutiny applies only to laws that effect "grave interference with important religious tenets or . . . affirmatively compel [congregants] to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Griffin High School v. Illinois High School Athletic Assoc.*, 822 F.2d 671, 674 (7th Cir. 1987). Whatever the obstacles that the CZO might present to a church's ability to locate on a specific plot of Chicago land, they in no way regulate the right, let alone interfere with the ability, of an individual to adhere to the central tenets of his religious beliefs. As the district court adroitly noted, the CZO's limitations on church location are "not the regulation of belief, any more than regulating the location of the *Chicago Tribune* building is the regulation of the newspaper's [F]irst [A]mendment-protected product." *Civil Liberties for Urban Believers*, 157 F.Supp.2d at 908.

Viewed through the lens of the *Cleburne* and *Forseth* rational basis analyses, Chicago's system of land-use regulation satisfies the requirements of the Equal Protection Clause. In general, a zoning ordinance imposing "restrictions in respect of the use and occupation of private lands in urban communities" such as the "segregation of residential, business, and industrial buildings" satisfies the rational basis test as "a valid exercise of authority." *Village of Euclid v. Amber Realty Company*, 272 U.S. 365, 386-87, 394, 397 (1926). Here, Chicago permits churches to locate in R districts as of right, while requiring Special Use approval in B and most C districts, not only to promote the general public welfare and to protect the character, stability, order, and efficient development of Chicago's varied areas, but

also to prevent overcrowding, to limit street congestion, and to conserve the taxable value of city land. 17 MUN. CODE CHI. § 2. Moreover, the CZO makes available avenues by which exceptions for nonconforming uses may be sought (and has made such exceptions in the cases of two plaintiff churches who applied for Special Use approval). Though the end result of this zoning scheme may be to afford churches better opportunities for location in R districts than B, C, or M districts, under the amended CZO churches still fare better than many other nonreligious assembly uses that are treated equally in B, C, and M districts but excluded from R districts. To the extent that the CZO treats churches any differently from nonreligious assembly uses, it does not disfavor churches. More importantly, any such difference is rationally related to Chicago's legitimate interest in regulating land use within its city limits. The CZO thus complies with the requirements of the Equal Protection Clause.

Finally, Appellants challenge the district court's analysis of their Fourteenth Amendment procedural due process claim.[9] Specifically, Appellants suggest that the district court's characterization of their claim against the Special Use approval procedures as one involving property rights, rather than any particular use or fundamental activity, is at odds with an earlier district court finding that Appellants' due process claim "asserted a fundamental liberty interest in their free exercise of religion, freedom of speech, and freedom of assembly." *See Civil Liberties for Urban Believers v. Chicago*, No. 94 C 6151 (N.D. Ill. Feb. 28, 1997) (memorandum opinion and order denying Chicago's motion to dismiss multiple claims). Appellants disregard the fact that this language comes from an order denying Chicago's

---

[9] "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST. amend. XIV, § 1.

motion to dismiss Appellants' due process claims pursuant to Rule 12(b)(6) of the FRCP. At the summary judgment stage, the district court's finding that a claim is properly stated for Rule 12(b)(6) purposes has no effect on its determination of the merits of that claim. Viewing the facts in a light most favorable to Appellants, the district court properly determined that, because Appellants challenged the alleged vagueness of the zoning procedures and standards in a manner that any property owner might so do irrespective of a particular property use or fundamental liberty, the claim focused on property rights rather than Appellants' right to worship. The district court then relied upon *River Park v. City of Highland Park*, 23 F.3d 164 (7th Cir. 1994), to determine that any facial due process attack on the CZO must be made in state court. As we stated in that case, in which a plaintiff corporation alleged that Highland Park's politically motivated refusal to act on its zoning application bankrupted the corporation and deprived it of procedural due process,

> Federal courts are not boards of zoning appeals [and] the procedures "due" in zoning cases are minimal. Cities may elect to make zoning decisions through the political process. . . . Highland Park made a political decision in a political fashion, employing procedural maneuvers that prevented the question from reaching the floor for a vote. . . . [Plaintiff] may not have received the process Illinois directs its municipalities to provide, but the Constitution does not require state and local governments to adhere to their procedural promises. Failure to implement state law violates that state law, not the Constitution; the remedy lies in state court.

*River Park*, 23 F.3d at 165-67 (citations omitted). Here, too, the CZO and its special approval procedures provide Appellants with all the legislative process that is due. Moreover, as the district court noted, the CZO expressly provides for the review of zoning decisions by the Illinois

Circuit Courts. *See* 17 MUN. CODE CHI. § 11.3-4; 65 I.L.C.S. § 5/11-13; 735 I.L.C.S. 5/3-104. As such, Appellants cannot prevail on their due process claim.

**CONCLUSION**

Drawing all factual inferences in Appellants' favor, we nonetheless conclude that their statutory and constitutional claims challenging the Chicago Zoning Ordinance are without merit. We therefore AFFIRM the district court's order granting the City of Chicago's motion for summary judgment.

POSNER, *Circuit Judge*, dissenting. This is a difficult case, but I have come to the conclusion that the restrictions that Chicago's zoning ordinance places on churches (a term that I use broadly to include any religion's place of worship) violate the equal protection clause of the Fourteenth Amendment. I do not address the other grounds on which the plaintiffs attack the restrictions. The discussion of those grounds occupies most of the majority opinion, which devotes little space to what seems to me to be the strongest ground of the appeal.

The ordinance creates three zones so far as relates to the equal protection issue. (I am using the term "zones" functionally rather than to designate categories in the zoning ordinance, which, as is apparent from the majority opinion, is extremely complicated.) The first "zone" is residential. Churches can locate there without having to obtain a permit from the zoning board, as can a number of other nonresidential entities, such as clubs, restaurants, schools,

libraries, and drugstores, though restaurants and drug-stores only in high-rise apartment buildings. Other nonresidential land uses in the residential zone, however, either require a permit or are banned outright. The second zone, which I shall call "commercial," is for business and other commercial uses, including not only office buildings and retail stores but also wholesale outlets, warehouses, and light manufacturing, but excluding certain transportation facilities and heavy manufacturing. In the commercial zone, churches require a permit. Last is a zone reserved for transportation facilities and heavy manufacturing, which I shall call the "manufacturing" zone. In it churches are flatly forbidden, although bars, restaurants, and union lodges are freely permitted.

The question is whether the City's restrictions on where churches may locate are rational. But "rationality" in the law of equal protection is not in fact a single standard, though the courts have been coy about admitting this. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), like this a zoning case, and decisions following it such as *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133-44 (3d Cir. 2002), and *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 471-72 (8th Cir. 1991), identify a category of sensitive uses or activities, where judges are to be more alert for unjustifiable discrimination than in the usual case in which government regulations are challenged on equal protection grounds. See *Lawrence v. Texas*, 123 S. Ct. 2472, 2484-85 (2003) (O'Connor, J., concurring); cf. *Plyler v. Doe*, 457 U.S. 202, 224-30 (1982). It is true that *Cleburne* refused to deem mental retardation a "quasi-suspect classification" warranting a standard of review more searching than that of rationality, see *City of Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at 442-46, and on this basis the City of Chicago in our case cites the decision in support of its position. But one has only to read a little further in the *Cleburne* opinion to realize that the Court was not treating

the zoning discrimination at issue there as it would have treated a discrimination in the taxation of railroads or the zoning of bowling alleys. Compare *Fitzgerald v. Racing Ass'n of Central Iowa*, 123 S. Ct. 2156, 2159-61 (2003). The ordinance challenged in *Cleburne* required a permit (which was denied) for a home for mentally retarded people in a zone in which hospitals and nursing homes, along with private houses and a variety of other residential facilities, were allowed without permit. The mentally retarded arouse distaste and even fear among many people, but the Court said that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." *City of Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at 448. The Court went through the other justifications that Cleburne had offered for the discrimination, found them wanting, and invalidated the ordinance.

The majority opinion in *Cleburne* is deficient in candor. Cf. Dennis J. Hutchinson, "More Substantive Equal Protection? A Note on Plyler v. Doe," 1982 *Supreme Court Review* 167, 168, 179, 194. As a separate opinion joined by three of the Justices pointed out, "The Court holds the ordinance invalid on rational-basis grounds and disclaims that anything special, in the form of heightened scrutiny, is taking place. Yet Cleburne's ordinance surely would be valid under the traditional rational-basis test applicable to economic and commercial regulation. In my view, it is important to articulate, as the Court does not, the facts and principles that justify subjecting this zoning ordinance to the searching review—the heightened scrutiny—that actually leads to its invalidation. . . . [T]he Court does not label its handiwork heightened scrutiny, and perhaps the method employed must hereafter be called 'second order' rational-basis review rather than 'heightened scrutiny.' But however labeled, the rational-basis test invoked today is

most assuredly not the rational-basis test of *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955), *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522 (1959), and their progeny." *City of Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at 456, 458.

We should follow what the Supreme Court does and not just what it says it is doing. The Court rejects a "sliding scale" approach to equal protection in words but occasionally accepts it in deeds. *Cleburne* instantiates though it does not articulate the proposition that discrimination against sensitive uses is to be given more careful, realistic, skeptical scrutiny by the courts than discrimination against purely commercial activities. *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); cf. *Lawrence v. Texas*, *supra*, 123 S. Ct. at 2482. And while it is true that the Court has rejected the proposition that "*Cleburne* stands for the broad proposition that state decisionmaking reflecting 'negative attitudes' or 'fear' necessarily runs afoul of the Fourteenth Amendment," adding that "although such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make," *University of Alabama v. Garrett*, 531 U.S. 356, 367 (2001), we should give due weight to "necessarily" and "alone." Previous decisions of this court and other courts of appeals have recognized that the *Cleburne* line of cases expands the boundaries of "rationality" review. See *Milner v. Apfel*, 148 F.3d 812, 816-17 (7th Cir. 1998); *Pontarelli Limousine, Inc. v. City of Chicago*, 929 F.2d 339, 341-42 (7th Cir. 1991); *Ramos v. Town of Vernon*, 331 F.3d 315, 320 (2d Cir. 2003); *Able v. United States,* 155 F.3d 628, 634 (2d Cir. 1998).

Churches are no less sensitive a land use than homes for the mentally retarded, as both *Congregation Kol Ami v. Abington Township*, *supra*, and *Cornerstone Bible Church v. City of Hastings*, *supra*, recognize, though the reason is different. The mentally retarded are victims of irrational

fears and cruel scorn; they are shunned. Religious people are not shunned, but religion arouses strong emotions, sectarian rivalry is intense and often bitter, and the mixing of religion and government is explosive. When government singles out churches for special regulation, as it does in the Chicago ordinance, the risk of discrimination, not against religion as such—Chicago is not dominated by atheists—but against particular sects, is great enough to require more careful judicial scrutiny than in the ordinary equal protection challenge to zoning.

Chicago's ordinance discriminates in favor of well-established sects. Not only did they acquire the land on which their churches are built in residential areas when such land was relatively cheap and abundant, and therefore affordable by noncommercial entities, such as churches (and there are of course some wealthy churches); in addition, because nonconforming uses are grandfathered, the churches that have managed to get permission to build over the years in nonresidential zones are untouchable. But what of new, small, or impecunious churches, such as the 40 to 50 obscure sects, one of which has only 15 members, that compose the principal plaintiff, Civil Liberties for Urban Believers? And obscure they are. It is telling that of the six other named plaintiffs—Christ Center (150 members), Christian Covenant Outreach Church (ministering to teenagers and former gang members), His Word Ministries to All Nations, Christian Bible Center (35 members), Church on the "Way" Praise Center, and Monte de Sino Church, only one (Christian Bible Center) is on the city's list of area churches. See http://www.thecityofchicago.org/church/.

As David Hume would have predicted, the greater vitality of American religion than of religion in countries in which there is an established church or churches owes much to our unwillingness to allow government to favor particular sects. Laurence R. Iannaccone, Roger Finke & Rodney

Stark, "Deregulating Religion: The Economics of Church and State," 35 *Econ. Inquiry* 350 (1997); Iannaccone, "The Consequences of Religious Market Regulation: Adam Smith and the Economics of Religion," 3 *Rationality & Soc'y* 156 (1991). By impairing religious competition, such favoritism turns many people—those not comfortable with the creed or clergy or congregants of the favored church—off religion.

Religious competition presupposes free entry into the religious "marketplace." A new church is unlikely, however, to have the resources necessary for building its place of worship in a residential area other than a slum, especially as the Chicago ordinance requires that the church provide parking, which will mean that unless its building is tiny it will have to acquire more than one city lot. A church that wants to build in the commercial zone, where land is cheaper, must obtain a special permit; and if it wants to build in the manufacturing zone, it is out of luck unless it can procure an amendment to the zoning ordinance. At issue in *Congregation Kol Ami v. Abington Township* was a zoning ordinance that *excluded* churches from residential areas; this is some evidence that the City is wrong to suppose that it is any longer the case that churches fit better into residential than nonresidential areas. The phenomenon of the "storefront church"—an apt description of the churches in this case—reflects both the inability of a new, small church to afford to build in a residential area and the fact that a new church needs to advertise its presence, which it can do at little cost just by being located in a commercial area, where there are more passersby than in a residential area.

> Small storefront or house churches can be found in many places in the city. A recent article by George Gallup reports that 40% of all American adults meet in small religious groups. Not surprisingly, a large number of these groups are in fact storefront or house

churches which revolve around Bible study, prayer, and Sunday school.

This is not happening in just a Christian context. Within the New Age movement, Muslim, Hindu, and even Jewish traditions, small groups are gathering in storefront meeting houses. These storefront worship spaces will continue to grow for many reasons, but the one that will affect them even more than group dynamics is city planning. As tighter zoning laws are pass[ed] in Boston and real estate prices continue to sky-rocket, the only place for churches to turn to are existing commercial spaces.

Robert L. Lewis, Jr., "Ministry Research Project: Storefront Churches of Boston; A Photographic Study of Selected Storefront and Home Churches in the City of Boston," http://www.bu.edu/ccrd/research/completed/storefront. html. The article is about Boston but the analysis in it is equally applicable to Chicago.

Granted, Chicago's prohibition against locating a church in the commercial zone is not absolute. A permit can be sought. But obtaining one is costly for a marginal enterprise; the zoning board enjoys broad discretion in deciding whether to grant or deny a permit; and a public hearing is required at which opposition to the church's application for a permit is predictable because churches do not enhance commercial activity (see Lucinda Harper, "Storefront Churches: The Neighbors Upscale Stores Don't Love," *Wall St. J.*, Mar. 15, 2000, at B1)—this is one of the reasons the City offers in defense of the ordinance. It is a bad reason, but it is the kind of reason likely to impress the zoning authorities.

It is a bad reason because while it is true that a church is less likely to enhance a commercial area than a Bloomingdale's or a Four Seasons is, there are very few blocks in Chicago that are purely commercial. A combination of grandfathering, the grant of special permits, and

changes in zoning law has produced a crazy quilt of land uses. On Michigan Avenue near our courthouse—an area zoned commercial as I have been using the term—retail stores, restaurants, hotels, colleges, office buildings, and clubs jostle cheek by jowl. If one of the clubs or colleges were replaced by a church, the commercial life of Michigan Avenue would not be affected, although the "tone" of the avenue might be lowered by a *store-front* church. (As a matter of fact, there *is* a church on Michigan Avenue—the Fourth Presbyterian Church. See http://www.fourthchurch.org/.) For remember those "negative attitudes" of which the Court spoke in *Cleburne*? Not only are mainline churches apt to be hostile to upstarts such as the members of Civil Liberties for Urban Believers, and particularly to storefront churches, but even people who are not caught up in sectarian rivalries might consider the presence of a church rather a downer in a "fast" district, such as Old Town. Indeed, a permit for one of CLUB's members was denied because it was thought that the presence of a church would impede the transformation of the area into a "nightclub district."

The City's brief offers the further, but absurdly paternalistic, argument that it is bad for the churches themselves to be located in commercial or industrial areas, because of noise and commotion. Obviously that is a judgment for the church to make rather than government, by trading off the cost to the church of noisy and profane surroundings against the benefits in lower costs of land acquisition and proximity to sinners, including prostitutes, drug addicts, and gang members, whose souls are particularly in need of saving. At oral argument the City's lawyer pressed another point, that the mysterious exclusion of churches from the manufacturing zone is justified by the fact that if they clustered there they might try to expel the factories by bringing a nuisance suit. Because Illinois rejects the doctrine of "coming to the nuisance," *City of Pana v. Central Washed Coal Co.*, 102 N.E. 992, 998 (Ill. 1913); *Oehler v.*

*Levy*, 85 N.E. 271, 273-74 (Ill. 1908); see also *Wheat v. Freeman Coal Mining Corp.*, 319 N.E.2d 290, 294 (Ill. App. 1974), it is not a defense to a nuisance suit that the nuisance was there before the plaintiff. The lawyer's vision of churches concentrating in the manufacturing zone and then bringing a nuisance suit to transform it into—what, a religious zone?—is fanciful. But even if it were realistic, the City, which is a part of Illinois state government from the standpoint of the application of the equal protection clause, cannot defend discrimination by arguing that it is coerced by state law. Otherwise a state could pass a law requiring the police to beat anyone they arrested, and police sued for violating the Fourth Amendment for using excessive force in effecting seizures of the person would have a defense, which no one believes. The state can untie the City's hands by authorizing a "coming to the nuisance" defense, either generally or just for the benefit of manufacturers whose factories are in cities. Anyway a nuisance suit would not succeed unless the plaintiff could show a net increase in land values from abating the nuisance; and if so this would imply that the City was better off for the suit.

The City's final argument is that the zoning ordinance represents a "global bargain" whereby churches get preferred treatment in the residential zone and secular uses get preferred treatment in the commercial zone. If one assumes, as I would, that the exclusion of commercial uses from the residential zone is rational (deny that, and one condemns virtually all zoning as irrational), the exclusion of churches from the commercial zone would be rational if their presence would crowd out commercial users. But that is an absurd suggestion. A slightly more realistic worry would be that if churches are allowed to bid for land zoned commercial, the price of such land will rise, to the detriment of commercial users of it, because the amount of land is fixed and the demand would have increased. But the aggregate demand of churches for land zoned commercial is

too slight in relation to the amount of that land for allowing them to bid on it to affect the price noticeably.

Thus far I have been discussing the ordinance as it was amended in 2000 in virtual acknowledgment that its predecessor was in violation of the Constitution. For the predecessor ordinance allowed fraternal lodges and other clubs, community centers, and other meeting places to locate in the commercial zone without obtaining a permit. (The amendment eliminated this privilege, though colleges, union lodges, libraries, and funeral homes, along with the conventional business and commercial establishments, retain it.) The only difference between them and churches is that they are secular. There is no difference so far as the use of land is concerned. The "global bargain" defense is particularly questionable as applied to the old ordinance. A church is no more or less suitable for the residential zone than a fraternal lodge and a fraternal lodge no more or less suitable for the commercial zone than a church. The old ordinance discriminated arbitrarily in favor of churches in the residential zone and against them in the commercial zone, thus distorting religious competition in favor of existing and against new churches. The new ordinance retains one completely unreasonable distinction, that between union lodges and churches, putting one in mind of the Spanish Civil War, a struggle between syndicalism and clericalism. The distinction between churches on the one hand and libraries and colleges on the other hand, another distinction retained by the amended ordinance, is only a little more rational.

The plaintiffs filed their suit almost a decade ago, before the ordinance was amended. The amendment did not moot their challenge to the old ordinance because they seek damages for the delay they encountered in obtaining permission to build in desirable locations. If as I contend the requirement of a permit was unconstitutional because it discriminated in favor of fraternal lodges, then the delay

the plaintiffs encountered in finding suitable quarters was the consequence of a constitutional violation and the plaintiffs are entitled to damages. As an example of the runarounds that the plaintiffs experienced in obtaining a special permit in the commercial zone, consider the hegira of the Christian Bible Church. From small beginnings (like Christianity itself), meeting in a private home, the congregation in 1988 began meeting in a funeral parlor, hardly an auspicious site. In 1990 it found a suitable building in the commercial zone, but did not apply for a permit after being told that the alderman for the ward in which the building was located would not allow a church at that location. The following year Christian Bible bought a building in another part of the commercial zone, applied for a permit, and was turned down. After trying without success to sell the building, the church renovated it, and while the building was closed for renovations the congregation met in rented quarters or private homes. The renovations completed, Christian Bible applied for and this time received a permit to use the building as its church. By now it was 1993; it had taken three years to find suitable space. As Christian Bible has only 35 members, the burden that the ordinance imposed on it was formidable.

Chicago's zoning ordinance imposes the same severe burden on new churches that the ordinance invalidated in the *Cleburne* case imposed on homes for the mentally retarded, and with no greater justification. In doing so it denied the plaintiffs the equal protection of the laws.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*